UNITED STATES of America,
Plaintiff-Appellee,

v.

Eugene HESS, Defendant-Appellant.

UNITED STATES of America,
Plaintiff-Appellee,

v.

Patrick ROSTIER, Defendant-Appellant.

Nos. 81–5222, 81–5288.

United States Court of Appeals,
Eleventh Circuit.

Nov. 15, 1982.

Gary R. Trombley, James H. Kynes, Tampa, Fla., for defendant-appellant in No. 81–5222.

Terrance A. Bostic, Asst. U. S. Atty., Tampa, Fla., for plaintiff-appellee in No. 81–5222.

Henry W. Lavandera, Tampa, Fla. (court-appointed), for defendant-appellant in No. 81–5288.

Lynn H. Cole, Asst. U. S. Atty., Tampa, Fla., for plaintiff-appellee in No. 81–5288.

Before HILL and HENDERSON, Circuit Judges, and GARZA *, Senior Circuit Judge.

GARZA, Senior Circuit Judge:

In June, 1980, a federal grand jury returned a nineteen count indictment charging ten individuals with conspiracy and substantive violations of 18 U.S.C. §§ 659, 2312, 2313, 2314 and 2315. Count one of the indictment charged that between February,

1975, and February, 1977, the defendants conspired with each other and others to steal and transport in interstate commerce certain goods and motor vehicles, and to receive, conceal, store, sell and dispose of certain goods and motor vehicles in violation of 18 U.S.C. §§ 659, 2312, 2313, 2314 and 2315. In addition to the conspiracy charge, appellant Hess was charged with receiving a portion of an interstate shipment of stolen fish in violation of 18 U.S.C. § 659, receiving a stolen Freuhauf trailer in violation of 18 U.S.C. § 2315 and receiving a stolen White Freight Liner tractor in violation of 18 U.S.C. § 2313. Appellant Rostier, in addition to the conspiracy charge, was charged with receiving stolen fish, possessing stolen seafood and possessing stolen carpeting in violation of 18 U.S.C. § 659 and receiving, concealing and storing a stolen backhoe and receiving, concealing and storing stolen seafood in violation of 18 U.S.C. § 2315.

Hess was found guilty of receiving a stolen White Freight Liner tractor in violation of 18 U.S.C. § 2313; Rostier was found guilty of receiving stolen fish, possessing stolen seafood and possessing stolen carpeting in violation of 18 U.S.C. § 659; and both were found guilty of conspiring to steal and transport in interstate commerce certain goods and motor vehicles, and to receive, conceal, store, sell and dispose of certain goods and motor vehicles in violation of 18 U.S.C. §§ 659, 2312, 2313, 2314 and 2315. Appellants Hess and Rostier appeal from their convictions. Appellants raise three issues: (1) Whether appellants' motions for acquittal as to the conspiracy charge should have been granted because of a prejudicial variance between the allegations in the indictment and the proof at trial; (2) Whether the evidence was sufficient to sustain appellants' conviction on the conspiracy charge, Rostier's conviction for knowingly possessing stolen seafood and Rostier's conviction for knowingly receiving and possessing stolen carpeting; and (3) Whether the evidence established that Hess received a "motor vehicle."

---

* Honorable Reynaldo G. Garza, U.S. Circuit Judge for the Fifth Circuit, sitting by designation.

In the summer of 1975, Arthur Collum and John Purvis entered into an agreement to steal vehicles and cargo, and to later sell said vehicles and cargo. As part of the arrangement, Collum was to obtain the shipments while Purvis was to act as the broker. The two agreed upon a percentage whereby each would share in the profits of each theft. During the course of the conspiracy, although a number of thefts took place, seven separate thefts have become the subject of the substantive counts. In December, 1975, Purvis and Collum, after delivering a load of citrus from Florida to Pennsylvania, began contacting dealers in the northeastern United States for the purpose of obtaining a load of goods to steal. Collum and Purvis eventually obtained a load of frozen fish from Sea-Cold, Inc., for transportation from Cleveland, Ohio, to Glochester, Massachusetts. While still in the area of Cleveland, Ohio, they were able to sell approximately 700 pounds of fish and then brought the remainder, approximately 40,000 pounds, to Florida.

Before departing Ohio, Purvis contacted defendant Wormack in St. Petersburg, Florida. Wormack, known as the "Bishop", due to his association with the Church of the Faithful, informed Purvis that he would be able to handle the stolen merchandise. Upon arrival in St. Petersburg, Florida, and after initial discussions with defendant Wormack, the fish was stored at American Freezers in St. Petersburg under a contract with the Church of the Faithful.

Although the fish was now under the control of Wormack, Purvis continued his efforts to arrange a sale. Purvis took some samples of the frozen fish to appellant Hess, informed Hess that the fish had been stolen and inquired if Hess wished to make a purchase. Sometime later, Hess purchased a quantity of the fish (exact amount was never determined) from Purvis. Following the agreement by Hess to purchase a portion of the fish, he sent his driver from Tampa to a warehouse in St. Petersburg to take delivery of the fish. After the fish had been loaded into appellant Hess' truck, his driver, Al Wyatt, paid defendant Wormack $2,000.00. The remainder of the fish was sold or given away by Wormack to individuals in the St. Petersburg area and also used to feed Wormack's congregation at the Church of the Faithful.

In April of 1976, Collum and McLendon hijacked a John Amis Meat Company truck in Montgomery, Alabama. The trailer was used to deliver the stolen cargo to Miami, Florida, for sale. Collum had been previously introduced to appellant Hess and at the time of his introduction informed Hess that he and Purvis were "in the business of getting loads and trucks." Collum then approached Hess concerning the purchase of the refrigeration unit from the stolen meat trailer. Following the delivery and inspection of the unit by appellant Hess, Hess and Collum were able to agree upon a sales price, after which Hess purchased the refrigeration unit.

The refrigeration unit which was purchased by Hess was attached to a 1972 Freuhauf trailer. Although the United States attempted to establish that the trailer was sold to William Lewis of Ruskin, Florida, in 1976, Mr. Lewis testified and produced a purported bill of sale which established he purchased the trailer in 1975.

In July, 1976, Collum and McLendon observed a truck at Variety Seafoods in the process of being loaded with frozen shrimp. Collum called Wormack in order to determine if Wormack had any interest in the shrimp. Wormack instructed Collum to take the shrimp directly to Pat Rostier in Fort Myers. Thereafter, Collum stole the loaded vehicle, proceeded to Fort Myers, and met with Rostier and Wormack.

Appellant Rostier stated to Collum that he could easily dispose of the stolen shrimp; however, after several days of unsuccessful effort on the part of Rostier, Collum located a new buyer for the shrimp in Miami.

The tractor which had been stolen was used to deliver the shrimp to Miami. Wiley Perry, an employee of Glenn Fox, drove the load to Miami and returned the tractor and trailer to Fox's place of business in Fort Myers. The tractor was sold to Glenn Fox and during the summer of 1977 agents from

the Federal Bureau of Investigation also located the 40 foot Great Dane trailer at Fox's place of business.

In August of 1976, Collum hijacked a truckload of tires and coffee from the Howard Hall Company Terminal in Montgomery, Alabama. After hotwiring the truck, Collum proceeded to Douglas Hulon's farm in Calera, Alabama. Collum had a working relationship and agreement with Hulon which allowed Collum to utilize Hulon's farm to park and store trucks and trailers. After "dropping the trailer" at the farm, Collum abandoned the tractor in Birmingham, Alabama. The following day Collum painted the trailer in order to disguise the Howard Hall markings, sold the tires to Ed Hulon, and stole a White Freight Liner tractor in order to take the coffee to Tampa.

Following his arrival in Tampa, Collum gave Purvis control of the Freight Liner tractor in order to "get rid of it." The tractor and trailer were initially taken to the residence of Jerry Helms, a friend of John Purvis' in Pine Crest, Florida. Collum then proceeded on to Fort Lauderdale with the trailer load of coffee. At the instructions of Eugene Hess, the cab was "chopped off" of the tractor and the remainder, i.e., frame, engine, wheels, transmission, etc., were delivered to Hess' place of business. Upon arrival, Hess also requested that Purvis remove the engine, transmission, and rear axle from the frame. This was accomplished at a location adjoining Hess' place of business at the instructions of appellant Hess. Appellant Hess then paid Purvis $2,500.00 for the vehicle.

While in Fort Myers to deliver the Variety Seafoods load, appellant Rostier informed Collum that he had a market in Fort Myers for stolen building supplies, such as lumber and carpet. In August, 1976, McLendon and Collum stole a trailer load of carpeting from the office of Reeves Transportation. The trailer contained approximately 41 rolls of plum-colored carpeting which was en route from Dalton, Georgia to Miami, Florida.

Collum then took the carpeting to defendant Fox's place of business in Fort Myers where he met with appellant Rostier. After it was determined by Rostier that the carpeting was not suitable, Wiley Perry, an employee of defendant Fox, transported the carpeting back to Tampa for storage in a private warehouse.

Several days later appellant Rostier was able to make suitable arrangements for the sale of the carpet. Thereafter, appellant Rostier met with Collum at a motel in Tampa, Florida, to finalize the sale and to receive a percentage for his efforts.

In July of 1976, Glenn Fox informed Collum that he would be willing to pay up to $5,000.00 each for a forklift and a backhoe. In October, 1976, Collum, Willie McLendon, and defendant Lynch stole a Ford 7500–4 backhoe and "low-boy" trailer in Fultondale, Alabama. The backhoe and trailer were delivered to Fort Myers and first taken to Glenn's Wrecker Service. Following a conversation with appellant Rostier, the backhoe and trailer were then moved to a construction site where Rostier and his employee, John Davis, were to take custody of the stolen property. Collum then received the check from Rostier, drawn upon the account of defendant Fox's business in the amount of $3,500.00. The backhoe was recovered by the F.B.I. in June, 1977 during a search of defendant Fox's business property.

In January, 1977, Purvis, McLendon, Robert Way, Debra Payne and Curtis Lynch hijacked a vehicle hauling shrimp on Interstate 75 North. The shrimp was taken to Fort Myers for delivery to Pat Rostier; however, after several days of unsuccessful effort, appellant Rostier was unable to dispose of the shrimp. Thereafter, the shrimp was delivered for sale to Fort Lauderdale, Florida.

Appellants contend that there was a fatal variance between the conspiracy allegation in the indictment and the proof adduced at trial. While count one alleged a single unified conspiracy, appellants assert that the evidence at trial indicated multiple conspiracies: one involving the thieves and some

of the recipients of the stolen property and the other involving the thieves and the appellants.[1] Appellants' contention is without merit.

■ The existence of an agreement is the primary requisite for establishing the existence of a conspiracy. *United States v. Perez,* 489 F.2d 51, 61 (5th Cir. 1973), *cert. denied,* 417 U.S. 945, 94 S.Ct. 3067, 41 L.Ed.2d 664 (1974). The agreement constitutes a single conspiracy "if the agreement contemplates bringing to pass a continuous result that will not continue without the continuous cooperation of the conspirators to keep it up." *United States v. Solomon,* 686 F.2d 863, 871 (11th Cir. 1982); *United States v. Perez, supra* 489 F.2d at 62. The principal factors this court considers in determining whether there is a prejudicial variance between an allegation of a single conspiracy and proof at trial are the existence of a common goal, the nature of the scheme and an overlapping of participants in various dealings. *United States v. Tilton,* 610 F.2d 302, 307 (5th Cir. 1980). Here, the conspirators shared the common goal of increasing their personal wealth;[2] the nature of the scheme varied little, if any, from hijacking to hijacking;[3] and there was an overlapping of the participants in the various dealings.[4] The evidence, therefore, established a single unified conspiracy.

■ This court recognizes that a fence does not automatically become a conspirator by purchasing stolen property. *See United States v. Meyers,* 646 F.2d 1142, 1145 (6th Cir. 1981); *United States v. Cook,* 461 F.2d 906, 910 n.3 (5th Cir. 1972), *cert. denied,* 409 U.S. 949, 93 S.Ct. 269, 34 L.Ed.2d 219 (1972); *United States v. Ford,* 324 F.2d 950, 952 (7th Cir. 1963). We also recognize, however, that for a hijacking conspiracy to be successful fences are necessary. Common sense dictates that a hijacker, such as Purvis, cannot eat an entire load of stolen fish by himself; he must sell the fish to a fence to make his theft profitable. A fence who holds himself out as a place to dispose of stolen goods, such as Rostier or Hess, is a conspirator.

Appellants have raised several points of error concerning the sufficiency of the evidence. Hess contends that the evidence failed to show that he was a member of the conspiracy. Rostier contends that the evidence failed to show he was a member of the conspiracy, failed to show he knowingly possessed stolen frozen seafood, and failed to establish he knowingly received and possessed stolen carpeting. We disagree with appellants.

■ When reviewing the district court's denial of a motion for judgment of acquittal, the evidence must be viewed in the light most favorable to the Government and all reasonable inferences favorable to the verdict of the jury must be drawn. *United States v. Gorel,* 622 F.2d 100, 106 (5th Cir. 1979). The Government's case was based on the testimony of Collum, McLendon and Purvis. At least one of them had direct personal knowledge of the involvement of Hess and Rostier in each of the transactions. The evidence was clearly sufficient to sustain the jury verdict and the trial court properly denied appellants' motions for judgment of acquittal.

1. As will be addressed below, appellants argue that the Government failed to prove the conspiracy between the thieves and themselves.

2. In *Tilton* the goal was accomplished by bribery while here the goal was accomplished by dealing in stolen property.

3. The thieves (Purvis, Collum, McLendon, Lynch and Way) sometimes prior and sometimes subsequent to the theft would contact a fence (Wormack, Hess, Rostier or Fox) and arrange for the sale of the stolen property in an amount below the market value.

4. The facts set out above can be separated into seven transactions. Note the overlapping of participants. In the first transaction Purvis, Collum, Wormack and Hess were involved. In the second, Collum, McLendon and Hess were involved. In the third, Collum, McLendon, Wormack, Rostier, Perry and Fox were involved. In the fourth, Collum, Hulon, Purvis, Helms and Hess were involved. In the fifth, McLendon, Collum, Fox, Rostier and Perry were involved. In the sixth, Collum, McLendon, Lynch, Rostier, Fox and Davis were involved. Finally, in the seventh transaction Purvis, McLendon, Way, Payne, Lynch and Rostier were involved.

Finally, Hess was found guilty of receiving a 1976 White Freight Liner tractor in violation of 18 U.S.C. § 2313. Section 2313 prohibits knowingly receiving a stolen motor vehicle which is a part of interstate commerce. A motor vehicle is defined, in 18 U.S.C. § 2311, as an "... automobile, automobile truck, automobile wagon, motorcycle, or any other self-propelled vehicle designed for running on land but not on rails." Hess argues that the property he received was not a motor vehicle as defined in 18 U.S.C. § 2311, and the district court, therefore, erred in denying his motion for judgment of acquittal.

■ In discussing the scope of 18 U.S.C. § 2313, the Supreme Court stated:

> Professional thieves resort to enumerable forms of theft, and Congress presumably sought to meet the need for federal action effectively rather than leave loopholes for wholesale evasion.

*United States v. Turley,* 352 U.S. 407, 417, 77 S.Ct. 397, 402, 1 L.Ed.2d 430 (1957). To allow a fence to escape prosecution by requiring the thief to dismantle the vehicle, after the sale was arranged, would frustrate the intent of Congress. *See United States v. McKlemurry,* 461 F.2d 651, 653 (5th Cir. 1972); *United States v. Abigando,* 439 F.2d 827, 831 (5th Cir. 1971). The district court, therefore, correctly found that the truck delivered to Hess was a motor vehicle.[5]

As the issues raised by appellants Rostier and Hess are without merit, their convictions shall stand.

AFFIRMED.

---

**5.** Hess relied on *United States v. Shanks,* 521 F.2d 83 (7th Cir. 1973), where the court found that unconnected truck parts (engine, transmission and other parts) did not constitute a motor vehicle. The result in *Shanks* is not contrary to the result reached here. In *Shanks,* the vehicle had already been dismantled at the time it was first offered to the defendant while in the case at hand the vehicle was dismantled at the request of Hess. Furthermore, the court recognized that "a person cannot avoid prosecution and conviction by the simple subterfuge of taking a vehicle apart." *Id.* at 86.