**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Oscar TORRES, Daniel Narvaez, and
Javier Dario Gomez,
Defendants-Appellants.**

No. 81–5827.

United States Court of Appeals,
Eleventh Circuit.

May 5, 1983.

Opinion on Granting of Rehearing En Banc Aug. 12, 1983.

Weiner, Robbins, Tunkey & Ross, William Tunkey, Geoffrey C. Fleck, Miami, Fla., for Torres and Narvaez.

Bruce H. Fleisher (Court Appt'd), Coral Gables, Fla., for Javier Dario Gomez.

Stanley Marcus, U.S. Atty., Robert J. Bondi, Jon May, Asst. U.S. Attys., Miami, Fla., for plaintiff-appellee.

Before KRAVITCH, HATCHETT and CLARK, Circuit Judges.

PER CURIAM:

Appellants Torres, Narvaez, and Gomez were convicted by a jury of conspiracy to possess with intent to distribute marijuana in violation of 21 U.S.C. § 846. On appeal they contend that evidence seized during warrantless searches should have been suppressed by the trial court and that the evidence was insufficient, as a matter of law, to sustain their convictions. We now affirm the conviction of Gomez, but reverse and remand as to Torres and Narvaez.

I

The investigation leading to the arrests of Torres, Narvaez, and Gomez began when a customs agent received confidential information that shipments of marijuana would be unloaded from two boats at Gallagher's Dock in the vicinity of Tavernier, Florida. Agents of the Drug Enforcement Administration, the United States Customs Service, and other police agencies began a surveillance in the vicinity of Gallagher's Dock. Agents kept watch on the area from a Winnebago equipped with radar and night scopes, near Gallagher's Dock, and at various times from a site near Harry's Place Restaurant, located at U.S. 1 and Ocean View Drive.

On March 21, 1981, a large Ford truck was sighted at Harry's Place around 6:00 p.m. The same truck was sighted at Gallagher's Dock around 8:00 p.m. Near midnight, agents spotted two boats on the radar screen. At approximately the same time, near the location at Harry's Place, other agents saw the Ford truck come down Ocean View Drive and turn onto U.S. 1, heading north. The agents followed the truck to an address on Atlantic Street. The agents remained a short distance away to observe all traffic going in the direction of the truck. They observed a brown van and

a white car proceed toward the Atlantic Street address. Ten minutes later, the brown van came back from the Atlantic Street address. The agents followed this van to 226 Buttonwood Lane. The agents then returned to the Atlantic Street address where the Ford truck was parked. Additional agents were called in.

Agents entered the property where the Ford truck was located and detected the odor of marijuana about the vehicle. The garage-type overhead door at the rear of the truck was opened, and appellant Gomez was observed standing inside the truck. Also observed inside the truck were several lemon trees and numerous burlap-wrapped bales that contained a substance later determined to be marijuana. Gomez was placed under arrest. Upon questioning, he informed the agents that he had been guarding the truck for someone else and was waiting until the person who claimed the truck arrived. Gomez later testified that he had no financial or possessory interest in the marijuana found in the truck. Gomez did not have the keys to the truck and asserted that he was not the driver of the truck.

Once Gomez was arrested, agents went to the nearby residence where they were informed that the truck in question belonged to a "Captain Al" who lived on Buttonwood Lane, several miles away. The agents proceeded to Captain Al's home, 226 Buttonwood Lane, where an agent had observed the brown van earlier. The home sits at the end of a street that culminates in a cul-de-sac. On arrival, the agents espied an individual walking toward them from the front of the home. This man was later identified as co-defendant Parker, whose indictment was subsequently dismissed. When questioned, Parker produced identification and stated that two other persons were in the home, but he was not aware of their names. Agents observed the brown van, which had previously been seen at Gallagher's Dock, in front of the home and saw bales of marijuana through the van windows. Marijuana residue, pieces of burlap, leaves and seeds were strewn from the van to the house. Marijuana residue was also observed on the steps going into the house. After placing Parker under arrest, the agents proceeded to the front doorway of the home.

To reach the front door, the investigating agents had to pass through an enclosed entranceway and proceed up a small set of steps.[1] An agent walked into the house and called out: "It's the police. Is there anybody in the house? Would you come where I can see you?" Record, Vol. 4 at 192. In response to this announcement, appellants Narvaez and Torres presented themselves. None of the agents had a warrant or had received any consent to enter the house.

After entering the house, an agent observed a pile of clothing that appeared to have a leafy residue on it in the living room. The agent also noticed that Narvaez and Torres obviously were freshly showered and were wearing clean clothes. The facts are in dispute as to whether both defendants were immediately placed under arrest. They were, however, advised of their constitutional rights to remain silent and to have counsel. Later, Narvaez requested permission to put on shoes that were in the hallway near the next room. An agent, following him, discovered eight small bales of marijuana in the nearby bedroom.

It was subsequently asserted in an affidavit of Alexander McLaughlin, the permanent resident of the house searched, that the appellants were invited guests on the premises the day before and the day of the search. Neither Torres nor Narvaez had keys to the home. At the time of the entry, which occurred at 1:30 a.m., Narvaez was cooking in the kitchen, and Torres came to the front of the house from the rear of the premises containing the bedroom and bathroom.

## II

Each of the appellants filed motions to suppress the physical evidence. After a

---

[1] At trial, Agent Mateer testified that this front door was open when the agents arrived. At the prior suppression hearing, however, Narvaez had testified that the door was closed.

hearing the magistrate recommended, and the trial court ruled after reviewing the record, that Gomez had no standing to object to any evidence seized from the truck in which he had been discovered.

At the evidentiary hearing conducted on the appellants' motion to suppress, the magistrate made direct inquiry of the government regarding whether there was any argument with respect to the standing of Torres or Narvaez to challenge the search of the house. The government responded in the negative and stated: "Given the [McLaughlin] affidavit, no, Your Honor." On the basis of this concession, the magistrate orally announced that Narvaez and Torres had standing to challenge the warrantless search in the home. The magistrate's written report, however, without illuminating the reason therefor, recommended that the motion to suppress as to Torres and Narvaez be denied. Paragraph 7 of the magistrate's conclusions of law states:

> The arrests of Daniel Antonio Narvaez and Oscar Torres were lawful and proper. A van loaded with marijuana—the marijuana was visible through the windows of the van—marijuana was in the yard or driveway of the house in which they were—marijuana residue lead from the van to the house—and marijuana residue was on the front steps of the house. The agents were merely following the scent and the trail. No testimony was offered by them as to their right to be in the house and as to any right of privacy or expectation of privacy. They had an affidavit of an Alexander McLaughlin but Mr. McLaughlin did not appear to submit himself to further examination.

> Nevertheless, the defendants answered to the cry of the Agents when they announced themselves and asked, "Is there anyone in the house" (T. 82, 93), and they came out. The arrests of Narvaez and Torres were based upon probable cause

and any further search of the premises was based upon what Agent Mateer saw in plain view (T. 82) and what he further saw when he followed Mr. Narvaez into another room to get a pair of shoes. This following was done for security purposes and was proper and lawful.

The citations refer to the transcript of the suppression hearing.

Due to the lack of clarity in the magistrate's written report, counsel for appellants Torres and Narvaez felt compelled to read it as concluding that they did *not* have standing. The issue was reargued before the district judge, and appellants Torres and Narvaez testified as to their presence in the house. Upon review of the magistrate's report and recommendation, the district court agreed with the magistrate that the motion to suppress should be denied, but substituted a new paragraph 7 for the one quoted above:

> Defendants Narvaez and Torres lack standing to contest the search and seizure of marijuana found in the house located at 226 Buttonwood Lane, Tavernier, Florida, and the brown Dodge van parked adjacent to the house. The Court finds that, based upon their testimony and an affidavit from Alexander McLaughlin, neither defendant enjoyed a legitimate expectation of privacy in either the house or the van, *Rakas v. Illinois,* 439 U.S. 128 [99 S.Ct. 421, 58 L.Ed.2d 387] (1978), sufficient to contest the search of the Dodge van or the house.

Neither the magistrate nor the district court made explicit alternative findings and conclusions concerning whether the warrantless search of the house was constitutional.

### III

The right to challenge a search or seizure as a violation of the fourth amendment [2] turns on "whether the person who claims

---

**2.** The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV.

the protection of the amendment has a legitimate expectation of privacy in the invaded place." *Rakas v. Illinois,* 439 U.S. 128, 99 S.Ct. 421, 430, 58 L.Ed.2d 387 (1978). *Rakas* shifted the focus of the standing question from whether an individual was an object of a search or seizure, to whether the individual's right to privacy in either the place searched or in the repository of the seized evidence was violated by the warrantless search and seizure. This focus requires a determination of "whether the disputed search and seizure has infringed an interest of the defendant which the Fourth Amendment was designed to protect." 439 U.S. at 140, 99 S.Ct. at 429, 58 L.Ed.2d at 399.

■ Appellants bear the burden of establishing that they had a legitimate expectation of privacy in the areas searched. *Rakas v. Illinois,* 439 U.S. at 130 n. 1, 99 S.Ct. at 424 n. 1, 58 L.Ed.2d at 393 n. 1; *United States v. Meyer,* 656 F.2d 979 (5th Cir.1981). Our review of appellants' claims thus entails an assessment of whether, viewing the evidence in the light most favorable to the government, appellants met their burden of proof. This determination of the legitimacy of appellants' claims to privacy from government intrusion requires a look at all the surrounding circumstances. *Rakas v. Illinois,* 439 U.S. at 152, 99 S.Ct. at 435, 58 L.Ed.2d at 406 (Powell, J., concurring).

### A. Gomez

■ On appeal Gomez urges that he had a sufficient privacy interest in the truck to invoke the fourth amendment. Gomez argues that a key element in assessing one's legitimate expectation of privacy in an area is the individual's right to exclude others from that area. He contends that he was hired by the truck's owner to secure the marijuana and to remain in the truck with the doors closed. He further argues that he had temporary possession of the property as a bailee, essentially asserting that he was the transferee of the truck owner's right to privacy.

As Gomez himself contends, however, the totality of the circumstances must be examined in determining an individual's right to challenge a search or seizure. Gomez testified at the suppression hearing that he had met a man in a coffee shop who hired him to watch over the marijuana. Gomez had no keys to the truck and did not know who was in possession of those keys. Gomez had not driven the truck and claimed no interest, financial or possessory, in the marijuana. All Gomez successfully established was that he hoped to remain in the truck undiscovered and prevent others from entering the truck and seizing the marijuana. The interest Gomez is asserting is quite simply one that the fourth amendment was not intended to protect. These circumstances lead to the conclusion that Gomez did not have a legitimate expectation of privacy in the rear of the truck.

### B. Torres and Narvaez

Torres and Narvaez contend that they have standing to challenge the warrantless entry and search of the home in which they were arrested because they were guests of the resident, Alexander McLaughlin. At the suppression hearing appellants presented McLaughlin's affidavit in which he stated that Torres and Narvaez had permission to stay in his home and use all areas of the house.[3] Torres testified before the lower

---

3. The affidavit stated:

COMES NOW, ALEXANDER McLAUGH-LIN, having been first duly sworn and cautioned to depose and testify to the truth in the above styled cause, and states under oath as follows:

1. My name is ALEXANDER McLAUGH-LIN. My date of birth is March 11, 1939. I am a white male, five feet, eleven inches (5'11") tall, approximately 140 pounds, with blue eyes.

2. I reside at 226 Buttonwood Lane, Tavernier, Florida. My social security number is 070–30–9778.

3. I resided at the Buttonwood Lane address during the entire month of March, 1981.

4. On or about March 20, 1981, and/or March 21, 1981, I gave Oscar Torres and Daniel Narvaez permission to stay in my home and gave them my permission and consent to have use of all areas of my home.

court that he and Narvaez were on a fishing vacation and had stayed in the house on Buttonwood Lane for two days. Torres stated that he believed McLaughlin, a friend of his, to be the owner of that house.

When questioned whether they had clothes at the house, Torres replied that their changes of clothing were at the cleaners. Torres stated that they ate and slept in the house with McLaughlin's permission. When Torres was asked if he came and went as he pleased, he replied, "Yes, but most of the time we don't know our way around. He [McLaughlin] take us." Record, Vol. 4 at 40. Torres also stated that he had not had a key to the house and had not been to the house since his arrest, except to ask McLaughlin to sign the affidavit.

Narvaez's testimony conflicted somewhat with that of his co-defendant and with the McLaughlin affidavit. Narvaez corroborated Torres's statement that they had been at the house for two days at the time of arrest, but, whereas McLaughlin's affidavit stated and Torres testified that he and Narvaez had unrestricted access to all areas of the house, Narvaez's testimony was somewhat confused.[4] Based upon the evidence and the testimony presented by Torres and Narvaez, the district court denied their motion to suppress, concluding that they did not enjoy a legitimate expectation of privacy in either McLaughlin's house or the brown van parked outside.

In a recent series of cases, *Rakas v. Illinois,* 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978), *United States v. Salvucci,* 448 U.S. 83, 100 S.Ct. 2547, 65 L.Ed.2d 619 (1980), *Rawlings v. Kentucky,* 448 U.S. 98, 100 S.Ct. 2556, 65 L.Ed.2d 633 (1980), the Supreme Court focused upon "the extent of a particular defendant's rights under the Fourth Amendment, rather than on any theoretically separate, but invariably intertwined concept of standing." *Rakas,* 439 U.S. at 139, 99 S.Ct. at 428.

Analyzed in these terms, the question is whether the challenged search or seizure violated the Fourth Amendment rights of a criminal defendant who seeks to exclude the evidence obtained during it.

---

5. Oscar Torres and Daniel Narvaez were, to my knowledge, living at 226 Buttonwood Lane, Tavernier, Florida on March 21, 1981 and March 22, 1981.

6. Oscar Torres and Daniel Narvaez had the right of access to the home during the entire time period commencing on April 21, 1981 through, to and including April 22, 1981.

7. The polaroid photograph which is attached hereto is a true photograph of the home located at 226 Buttonwood Lane, Tavernier, Florida. I have affixed my signature to my photograph.

Affidavit of Alexander McLaughlin, Record 157–58.

4. The colloquy on direct examination progressed as follows:

Q. Were you saying [sic] in the home with your friend Oscar Torres?
A. Yes.
Q. Before your arrest, how many days were you staying there?
A. Two days.
Q. What rooms in the home did you have access to?
A. The porch and more or less a porch and a parlor, more or less.
Q. How about the bedrooms?
A. No.
Q. Now, during the time you were staying there, did you eat there?
A. Yes.
Q. Did you sleep there?
A. Yes.
Q. Did you use the bathroom?
A. Yes.
Q. Were there times you came and went when Mr. McLaughlin was not there?
A. No. I was over inside the house.
Q. Were there times he came into the home or left the home when Mr. McLaughlin was not even there?
A. The only time I left the house was when Mr. McLaughlin took us out.
Q. Did you ever enter the home when Mr. McLaughlin was not there?
A. Never.

Record, Vol. 4 at 45–46. Narvaez's testimony was conducted through an interpreter, a circumstance that may explain the confusion in the testimony. Narvaez's testimony implies that appellants' access was limited to the living room and porch of the house. Direct evidence showed, however, that Narvaez was in the kitchen cooking at the time of the warrantless entry, and that shortly thereafter, he went to another portion of the house to retrieve his shoes. We determine that the evidence clearly supports a finding that appellants had access to the entire house.

That inquiry in turn requires a determination of whether the disputed search and seizure has infringed an interest of the defendant which the Fourth Amendment was designed to protect.

*Id.* at 140, 99 S.Ct. at 428.

Thus, our inquiry is twofold. First, we must determine whether the appellants had a constitutionally justifiable expectation of privacy that was disturbed by the intrusion. If the appellants successfully assert such a privacy interest, then we must decide whether the applicable probable cause and warrant requirements of the fourth amendment were satisfied by the law enforcement agents. *See Rawlings v. Kentucky,* 448 U.S. 98, 110–12, 100 S.Ct. 2556, 2564–2565, 65 L.Ed.2d 633 (1980) (Blackmun, J., concurring). While undertaking this analysis, we are cognizant that "[t]he proponent of a motion to suppress has the burden of establishing that his own Fourth Amendment rights were violated by the challenged search or seizure." *Rakas,* 439 U.S. at 130 n. 1, 99 S.Ct. at 424 n. 1 (citing *Simmons v. United States,* 390 U.S. 377, 389–90, 88 S.Ct. 967, 973–974, 19 L.Ed.2d 1247 (1968); *Jones v. United States,* 362 U.S. 257, 261, 80 S.Ct. 725, 731, 4 L.Ed.2d 697 (1960)).

■ "Legitimation of expectations of privacy by law must have a source outside the Fourth Amendment, either by reference to concepts of real or personal property law or to understandings that are recognized and permitted by society." *Rakas,* 439 U.S. at 143 n. 12, 99 S.Ct. at 430 n. 12. Nevertheless, property rights are neither the beginning nor the end of the fourth amendment inquiry. *United States v. Salvucci,* 448 U.S. 83, 92, 100 S.Ct. 2547, 2553, 65 L.Ed.2d 619, 628 (1980). Other factors enter into the calculus, no single integrant being determinative. The additional circumstances to be considered include whether the appellants enjoyed the right to exclude others from the property, or whether they had a possessory interest in the articles seized, and what precautions were taken to assure their privacy. *See United States v. Haydel,* 649

F.2d 1152, 1154–55 (5th Cir.1981), *modified,* 664 F.2d 84, *cert. denied,* 455 U.S. 1022, 102 S.Ct. 1721, 72 L.Ed.2d 140 (1982).[5]

In *Haydel,* an evaluation of these factors led to the conclusion that Haydel did have a legitimate expectation of privacy in the place searched, his parents' home. Haydel had his parents' permission to use their home; he had unencumbered access and a key to the home; he kept clothing there and occasionally remained overnight; he conducted his gambling activities at the home and he owned the items that were seized. Additionally, the records seized were stowed in a box under a bed, a place society recognizes as an especially private area.

Similar factors were present in *Jones v. United States,* 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960), in which the Supreme Court permitted Jones to challenge the search of his temporary residence, the apartment of a friend. In *Rakas,* the Supreme Court reviewed *Jones* approvingly, emphasizing that Jones had a key to the apartment, was the sole occupant of the apartment because the lessee was away for several days, and he had possessions there. The Court considered particularly important Jones' complete dominion over the apartment and his ability and right to exclude all others. In *Rakas,* the Court explicitly abandoned its prior "legitimately on the premises" test, 439 U.S. at 142–43, 99 S.Ct. at 429–30, 58 L.Ed.2d at 400–01, reasoning that an individual must show more than mere legitimate presence to substantiate a legitimate expectation of privacy.

The former Fifth Circuit applied the *Rakas* analysis in *United States v. Meyer,* 656 F.2d 979 (5th Cir.1981). Meyer sought to challenge the warrantless search of an apartment in which he was visiting. Less than an hour after Meyer had entered the apartment with an undercover Drug Enforcement Administration (DEA) agent, other DEA agents forced their way into the apartment and subsequently discovered a

---

**5.** We are bound by decisions of the Fifth Circuit rendered prior to October 1, 1981. *Bonner* *v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981) (en banc).

cardboard box containing approximately one kilogram of cocaine in a cabinet under the bathroom sink. Unlike appellants Torres and Narvaez, Meyer was not an overnight guest, nor did he have unencumbered access to the apartment. Meyer kept no personal belongings in the apartment and was nothing more than a casual visitor. The court, following the analysis employed in *Rakas,* 439 U.S. at 142, 99 S.Ct. at 429, ruled that Meyer had failed to establish a legitimate expectation of privacy in the area searched.

The case at hand is distinguishable from *Meyer* in several crucial ways. The unrebutted evidence established that Torres and Narvaez were McLaughlin's house guests and that they enjoyed, by McLaughlin's own admission, unrestricted access to all parts of the house. They ate, slept, and stored their personal belongings in the house. In short, they adopted McLaughlin's residence as their own and thus acquired a legitimate expectation of privacy that is "recognized and permitted by society." Meyer's situation was not comparable.

More recently, the present Fifth Circuit addressed the same issue in *United States v. Briones-Garza,* 680 F.2d 417 (5th Cir.1982).[6] Briones-Garza was a temporary resident of a drop house, where transient illegal aliens were kept until their freedom was bought. Briones-Garza had neither a proeprty nor possessory interest in the drop house, but had resided there for three weeks. He slept, ate, and stored his personal belongings there. Despite Briones-Garza's assertion that the presence of many other illegal aliens did not expose the house to the public or constitute a waiver of any expectations of privacy, the court held that Briones-Garza did not have a legitimate expectation of privacy in the drop house. The ever-changing population of the house precluded any semblance of privacy. In concluding that Briones-Garza did not have an expectation of privacy, the court noted that a person normally expects his residence to be private. The court reiterated, however, that

residency is not a talisman leading inevitably to a conclusion that there is an expectation of privacy, particularly where there was "not a residence in any normal sense of the word." 680 F.2d at 421. Narvaez and Torres were the only residents, save perhaps McLaughlin, in the house. There was not a constant stampede of people coming through the house. Thus, this case is factually distinguishable from *Briones-Garza.*

■ We conclude that Torres and Narvaez met their burden of establishing a legitimate expectation of privacy. Torres and Narvaez spent two days eating and sleeping in the house. Although they did not have keys to the house, Torres and Narvaez were much more than casual visitors or mere transients. They enjoyed unrestricted access to at least the common areas of the house, and the evidence supports such a finding with regard to the bedrooms and other areas as well. They kept their personal belongings in the house and had been there for two days at the time of the arrest. Except for McLaughlin, they were the only occupants. When an owner invites someone to his home as his overnight house guest, the expectation of privacy the guest has is akin to that enjoyed by an occupant of a hotel room. The expectation of privacy in a private residence and its appurtenant area is one that society has long recognized as justifiable and legitimate. *Katz v. United States,* 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). The Supreme Court implicitly distinguished the appellants' situation from that of a "casual visitor" in *Rakas,* 439 U.S. at 142–43, 99 S.Ct. at 429, 430, 58 L.Ed.2d at 400–01. Torres and Narvaez enjoyed a legitimate expectation of privacy in the residence that was destroyed by the warrantless intrusion of the law enforcement agents. The district court erred in holding otherwise.

■ The dissent confuses the merits of the case with whether the fourth amendment rights of the appellants were implicated by the warrantless entry and search of the house. Evidence as to guilt or inno-

---

**6.** *Briones-Garza* was decided after the former Fifth Circuit divided, and it is not a decision of Unit B of the former Fifth. Therefore, the case is merely persuasive, not binding, authority.

cence of the substantive offense charged has no bearing on whether or not a defendant enjoys a legitimate expectation of privacy in the place searched. To extend the dissent's logic to its ultimate conclusion would be to render the fourth amendment warrant requirement meaningless.

■ We reach a different conclusion respecting appellants' legitimate expectation of privacy in the van parked in the driveway of McLaughlin's house. Under *Rakas, Rawlings,* and *Salvucci,* it is necessary for the proponent of the motion to suppress to substantiate his own expectation of privacy in the curtilage. *See Rakas,* 439 U.S. at 130 n. 1, 99 S.Ct. at 424 n. 1. This, the appellants have failed to do. The only evidence produced concerning the van before either the magistrate or the district judge on the motion to suppress was that the van's keys were retrieved from inside the house. Appellants simply failed to shoulder their burden. Therefore, the district court was correct in denying the motion to suppress the evidence seized from the van.

### IV

A determination that Torres and Narvaez may challenge the search of McLaughlin's house and the seizure of the marijuana from the bedroom does not end our task. Given the completeness of the record, we must now decide whether the applicable probable cause and warrant requirements of the fourth amendment were satisfied by the officers.

■ We recently set forth the exceptions to the fourth amendment warrant requirement and their underlying rationales in *United States v. Blasco,* 702 F.2d 1315 at 1324 (11th Cir.1983), and consequently, rather than repeat that discussion here, we rely on our analysis in *Blasco.* In the instant case, the officers failed to secure a warrant from a detached and neutral magistrate; we must determine, therefore, whether probable cause and exigent circum-

stances excused the failure to obtain a search warrant. In this inquiry we must bear in mind Justice Bradley's admonition almost a century ago in *Boyd v. United States,* 116 U.S. 616, 635, 6 S.Ct. 524, 535, 29 L.Ed. 746, 752 (1886):

> It may be that it is the obnoxious thing in its mildest and least repulsive form; but illegitimate and unconstitutional practices get their first footing in that way, namely: by silent approaches and slight deviations from legal modes of procedure. This can be obviated by adhering to the rule that constitutional provisions for the security of person and property should be liberally construed. A close and literal construction deprives them of half their efficacy and leads to gradual depreciation of the right, as if it consisted more in sound than in substance. It is the duty of courts to be watchful for the constitutional rights of the citizen, and against any stealthy encroachments thereon. Their motto should be *obsta principiis.*

The burden is upon those who seek exemption to demonstrate that the exigencies of the situation made the course actually taken imperative. *Coolidge v. New Hampshire,* 403 U.S. 443, 455, 91 S.Ct. 2022, 2032, 29 L.Ed.2d 564, 576 (1971) (citing *United States v. Jeffers,* 342 U.S. 48, 51, 72 S.Ct. 93, 95, 96 L.Ed. 59, 64 (1951)).

■ First, we consider whether the agents had probable cause to believe that a crime had been or was being committed. Unquestionably, the Government has satisfied this burden. The agents, from the information furnished by the confidential informant and from their subsequent surveillance, had a reasonable suspicion that a marijuana off-load was underway. This reasonable suspicion blossomed into probable cause when, after following the van from the dock area to the Buttonwood address, the agents peered through the windows of the van parked outside of McLaughlin's house and saw bales of marijuana inside.[7] Marijuana was strewn from

---

**7.** We voice no opinion as to the propriety of the agents' entering McLaughlin's private property

to peer into the van. We note only that appellants Torres and Narvaez failed to demonstrate

the van to the front of the house, further substantiating the agents' belief that they had uncovered a marijuana operation.

As we noted in *Blasco,* at 1325, "[p]robable cause, without more, would be insufficient to justify the warrantless entry" into the house. The Government bears the additional burden of proving that the exigencies of the situation prevented the agents from securing a search warrant from a detached and neutral magistrate. In support of its contention that the warrantless search and seizure was proper under the circumstances of this case, the Government argues that the risk of loss, destruction, removal, or concealment of the marijuana was so great that the agents were forced into action. We disagree. The presence of contraband without more does not give rise to exigent circumstances. It is improbable that the appellants could have concealed or destroyed the 200 pounds of marijuana found in the house before the agents moved in. Had appellants attempted such a course of action exigent circumstances would have been presented. The agents, however, had no reason to speculate that the evidence was being destroyed or that it was even subject to that risk. There is no evidence that Torres and Narvaez, were aware of the officers' surveillance; thus they had no reason to destroy the contraband or to flee the premises. Without an imminent risk of destruction of the evidence, the agents had no right to enter the house without a search warrant. *See Vale v. Louisiana,* 399 U.S. 30, 90 S.Ct. 1969, 26 L.Ed.2d 409 (1970) (no exigent circumstances present to justify search of house for contraband where defendant was arrested on front steps). Here is no evidence of exigent circumstances to justify the failure to procure a search warrant. Several agents were present in the immediate area. Surveillance could have been easily maintained while an agent procured a warrant. Even in the middle of the night, a warrant can be obtained by telephone. Failure to obtain a warrant in these circumstances rendered the entry and

that their own fourth amendment interests were implicated by the agents' actions concern-

search of the house unconstitutional. Therefore, the evidence obtained as the fruit of the warrantless entry—including the marijuana inside the house, appellants' clothes, the van keys, and any statements made by appellants Torres and Narvaez— must be suppressed.

V

■ Having sustained the legality of the search and seizure of the truck in which Gomez was found, we must now consider his claim that the evidence before the trial court was insufficient to sustain his conviction. Gomez argues that the government failed to meet its burden of proof in this conspiracy case:

> Proof of guilt of the crime of conspiracy must convince beyond a reasonable doubt that a conspiracy existed, that the defendant knew it, and with that knowledge intentionally did some act or thing to further or carry on that conspiracy.

*United States v. Duckett,* 550 F.2d 1027, 1030 (5th Cir.1977). Appellant suggests that all the government was able to establish at trial was his presence at the scene of a crime. This alone is not enough to sustain a conspiracy conviction. *United States v. DeSimone,* 660 F.2d 532 (5th Cir.1981), *cert. denied,* 455 U.S. 1027, 102 S.Ct. 1732, 72 L.Ed.2d 149, 456 U.S. 928, 102 S.Ct. 1976, 72 L.Ed.2d 44 (1982). Proof of a conspiracy, however, may be by inferences from the conduct of the participants or from circumstantial evidence. *United States v. Ayala,* 643 F.2d 244, 248 (5th Cir.1981).

The jury here may have reasonably inferred, from Gomez's presence inside a truck containing 1600 pounds of marijuana and from the many observations of the agents regarding the location of the truck at various times of day, that Gomez was involved in a conspiracy to distribute marijuana. Although Gomez admittedly appears to have played a minor role in the total scheme, conviction for conspiracy re-

ing the van.

quires no more. *United States v. Wilson,* 500 F.2d 715, 724 (5th Cir.1974), *cert. denied,* 420 U.S. 977, 95 S.Ct. 1403, 43 L.Ed.2d 658 (1975).

■ In reviewing this jury verdict, we must sustain appellant's convictions if, taking the view most favorable to the Government, a reasonable trier of fact could find that the evidence establishes guilt beyond a reasonable doubt. *United States v. Bell,* 678 F.2d 547, 549 (5th Cir.1982) (Unit B en banc), *cert. granted,* —— U.S. ——, 103 S.Ct. 444, 74 L.Ed.2d 600 (1982).[8] A review of the record demonstrates that the jury might reasonably have concluded that the evidence established Gomez's guilt beyond a reasonable doubt. Thus, we affirm the conviction of Gomez.

### VI

We affirm Gomez's conviction, but we reverse the convictions of Torres and Narvaez, and remand their case for proceedings not inconsistent with this opinion.

AFFIRMED IN PART, REVERSED IN PART and REMANDED.

CLARK, Circuit Judge, dissenting:

I dissent from that portion of the majority opinion (Part III–B) which holds that Torres and Narvaez had standing to challenge the warrantless entry and search of the house. I differ from the majority in my interpretation of the facts and the conclusions I draw from those facts.

In reaching its conclusion that Torres and Narvaez had standing, the majority relies in part on the affidavit of Alexander McLaughlin. (Majority opinion at 1292, n. 3). A review of the entire record indicates that McLaughlin is the "man who got away," presumably because the government had insufficient evidence to indict him. The district court apparently gave no credence to McLaughlin's affidavit, which did not meet the hearsay exceptions of Fed.R. Evid. 804.

The majority opinion notes that Torres testified that he and Narvaez were friends of McLaughlin, were on a fishing vacation, and had stayed in McLaughlin's house for two days. (Majority opinion at 1292). The trial court was justified in disbelieving that testimony. No credible evidence supported

Torres' and Narvaez' contentions that they had stayed in the house for two days or that a fishing vacation was in progress. McLaughlin never personally appeared to testify on behalf of his "friends." Torres' statement, apparently accepted by the majority, that their changes of clothing were at the cleaners strains credibility. Additionally, the van full of marijuana outside the house and the trail of marijuana from the van to the front door of the house would not convince most triers of fact that these two defendants were on a fishing expedition.

On this flimsy evidence, the majority concludes that: "Torres and Narvaez met their burden of establishing a legitimate expectation of privacy," and that "Torres and Narvaez were much more than casual visitors or mere transients." (Majority opinion at 1295).

The district court saw these witnesses, heard the evidence, and rejected the claim of an expectation of privacy. I would affirm the district court's decision. Torres and Narvaez did not own the house. They had no key to the house. The alleged, but unproven, owner of the house did not testify that these two men were his guests. The tracking of the vehicles from the dock to the house, together with the physical evidence, indicated that the defendants had participated in a marijuana smuggling operation. Faced with these facts, I think the district court reached the conclusion that most people would reach—Torres and Narvaez were caught with the marijuana in a house being used as a transient storage point, and they came up with the best story they could. Their story did not convince the district court and does not convince me that Torres and Narvaez established a legitimate expectation of privacy. I would affirm all of the findings and conclusions of the district court with respect to the denials of the motions to suppress.

### ON PETITION FOR REHEARING

Before GODBOLD, Chief Judge, RONEY, TJOFLAT, HILL, FAY, VANCE, KRAVITCH, JOHNSON, HENDERSON, HATCHETT, ANDERSON and CLARK, Circuit Judges.

BY THE COURT:

A member of the Court in active service having requested a poll on the application

---

**8.** Decisions of Unit B of the former Fifth Circuit are binding upon this court. *Stein v. Reyn-* *olds Securities, Inc.,* 667 F.2d 33, 34 (11th Cir. 1982).

for rehearing and a majority of the judges in active service having voted in favor of granting a rehearing en banc,

IT IS ORDERED that the causes shall be reheard by this Court en banc on briefs without oral argument on a date hereafter to be fixed. The Clerk will specify a briefing schedule for the filing of en banc briefs.