**UNITED STATES of America,
Plaintiff-Appellee,**

**v.**

**Jose Celso GARCIA, Michael Trupei,
Defendants-Appellants.**

**No. 84–5033
Non-Argument Calendar.**

United States Court of Appeals,
Eleventh Circuit.

Sept. 10, 1984.

Rehearing Denied Oct. 3, 1984.

Geoffrey C. Fleck, Miami, Fla., for Garcia.

Carlos A. Rodriguez, Miami, Fla., for Trupei.

Stanley Marcus, U.S. Atty., Michael Hursey, Linda Collins-Hertz, Asst. U.S. Attys., Miami, Fla., for defendants-appellants.

Before RONEY, FAY and JOHNSON, Circuit Judges.

PER CURIAM:

Jose Celso Garcia and Michael Trupei have appealed their convictions, in the United States District Court for the Southern District of Florida, for possession with intent to distribute cocaine, in violation of 21 U.S.C.A. § 841(a)(1), and conspiracy to possess with intent to distribute cocaine, in violation of 21 U.S.C.A. § 846. We find no violations of the appellants' right to a speedy trial or their right to be free from illegal searches and seizures, nor do we believe that the district court admitted into evidence any improper testimony. We also conclude that sufficient evidence existed to

support the jury's guilty verdicts. Therefore, we affirm the convictions.

On May 18, 1983, an informant introduced David Peterson, a Special Agent working undercover for the Drug Enforcement Agency (DEA), to Joseph Vukovic. Peterson told Vukovic that he was interested in buying four or five kilos of cocaine. Five days later Vukovic called Peterson and offered to introduce him to Michael Trupei; Peterson accepted the invitation and the three men met that day at Vukovic's ground level apartment in Broward County, Florida. Trupei told Peterson that he could supply forty to fifty kilos of cocaine, but that he preferred to sell one kilo at a time until a buyer proved trustworthy, and only then would Peterson be able to purchase the four to five kilos that he wanted. Peterson agreed to purchase one kilo for $55,000 if Trupei would allow him to sample the cocaine before the exchange. As he was leaving, Peterson asked how to contact Trupei in the future and was told by Trupei to contact him through Vukovic.

The next afternoon Trupei called to tell Peterson that he had a "picture," meaning a sample of cocaine, to show him. Peterson agreed to meet again at Vukovic's apartment and when he arrived Trupei handed him (in the presence of Vukovic) a small plastic envelope containing cocaine. Trupei then informed Peterson that his new supplier of cocaine would require Peterson to bring the $55,000 to an auto body shop in Miami. Peterson, knowing that his superiors would not approve such a transaction, objected both to the method and the amount of payment expected of him. He promised to contact Trupei later (again, through Vukovic) and left.

Vukovic called Peterson again on August 1 to say that Trupei could offer a kilo for less than $55,000, with payment to be made in Broward County rather than in Miami. Peterson sounded interested, so two days later Trupei called to ask Peterson to meet him at a restaurant at 2:00 p.m. There they agreed that Trupei would sell Peterson one kilo of cocaine (to be delivered from Miami by Jose Garcia) for $40,000, to be followed by larger sales in the future if the first transaction went well. Trupei asked that they close the deal at the Vukovic apartment. Peterson, after calling ahead to insure that Trupei was ready, came to the apartment at 3:15 p.m. on August 3 to make the exchange. Trupei, who was there with Jose Garcia and Leon Ziegler, asked Garcia to bring in the "stuff," meaning the cocaine. Garcia went outside, and removed a package containing the cocaine from the trunk of the car that he had driven to Vukovic's apartment, and went back inside. Garcia then helped Peterson open the package to test the cocaine, indicating to him that the cocaine was of high quality. After testing the sample, Peterson locked the package in his briefcase and left it on a table while he went out with Trupei to get the money. DEA agents arrested Trupei outside and apprehended Ziegler when he came out of the apartment five minutes later.

The agents waited another five minutes, then decided to enter the apartment before Garcia could escape or destroy the cocaine. They knocked on the door and identified themselves as federal agents; hearing shuffling noises inside that sounded to them as if Garcia was trying to escape, they broke inside to find Garcia hidden in a closet.

The grand jury indicted Garcia and Trupei on August 12, 1983 and on August 23 they were arraigned. These two defendants filed at least a dozen pretrial motions between the time of their arraignment and the impaneling of the jury on November 30, 1983.

 Appellant Trupei challenges the judgment against him on four different grounds. Most notably, he claims that the trial judge should have excluded from evidence the cocaine seized at the time of the arrest because the agents seized it illegally. The government questions Trupei's standing to raise this issue because he did not have a legitimate expectation of privacy in Vukovic's apartment, primarily because he was not the owner or lessee. Of course, legal ownership is not a prerequisite for a

legitimate expectation of privacy. *Jones v. United States*, 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960). On the other hand, mere presence in the apartment would not be enough to give Trupei standing, for the precedents binding on this court require that an occupant other than the owner or lessee of an apartment demonstrate a significant and current interest in the searched premises in order to establish an expectation of privacy. *See Rakas v. Illinois*, 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978); *United States v. Sneed*, 732 F.2d 886 (11th Cir.1984) (no expectation of privacy demonstrated when defendant only alleged that he was present on searched premises as a guest); *United States v. Rackley*, 724 F.2d 1463 (11th Cir.1984) (person lacked standing to contest search of garage even though he had stayed overnight in guest bedroom at an earlier date). The standing question is a close one here, because Trupei can show that he had more than a tenuous interest in the Vukovic apartment. He met three times there to discuss business and asked Peterson to contact him by calling there. On the day of the arrest, Trupei was in control of the premises. He had invited at least two of those present and he answered the phone when Peterson called that afternoon. He was present in the room with the cocaine moments before the search took place.[1]

■ Yet, these factors do not allow us to conclude that Vukovic's apartment was Trupei's place of business or temporary residence. He used it by appointment only and stored no personal belongings there.

His contacts with the apartment, at least on the evidence appearing in the record, were not regular or personal enough to establish an expectation of privacy. *Cf. United States v. Torres*, 705 F.2d 1287 (11th Cir.) (per curiam), *vacated, en banc consideration withdrawn pending remand to panel*, 718 F.2d 998 (en banc) (per curiam) *on remand* 720 F.2d 1506 (1983); *United States v. Haydel*, 649 F.2d 1152, 1154–55 (5th Cir.1981), *modified*, 664 F.2d 84, *cert. denied*, 455 U.S. 1022, 102 S.Ct. 1721, 72 L.Ed.2d 140 (1982).

■ Trupei also claims the agents searched the apartment in violation of the federal "knock-and-announce" statute.[2] He concedes that the agents knocked and identified themselves, but objects to the fact that the agents did not announce their purpose in entering the apartment. This is, at most, a technical violation of the statute. *See United States v. Cueto*, 611 F.2d 1056, 1062 (5th Cir.1980) (suggesting that identification as FBI agents satisfies "letter and spirit" of statute). But even if the agents did not fully comply with the statute, exigent circumstances made full compliance unnecessary in this case. After Ziegler became suspicious and left the apartment, the agents could reasonably have believed that Garcia had dismantled the brief case and was able to wash the cocaine down the sink in the kitchen or bathroom if he were given any time alone. Garcia might have been armed, and the shuffling noises heard through the door suggested to the agents that he was trying to escape. The real possibility of injury,

---

**1.** The sole fact that Trupei was not present in the room at the exact moment of the search cannot deprive him of standing any more than stepping outside of a car deprives an owner of standing to challenge an illegal search of the passenger compartment. Trupei was still present nearby when the search took place and was prevented by the police from returning to the room as he had planned.

**2.** 18 U.S.C.A. § 3109:

The officer may break open any outer or inner door or window of a house, or any part of a house, or anything therein, to execute a search warrant, if, after notice of his authority and purpose, he is refused admittance or

when necessary to liberate himself or a person aiding him in the execution of the warrant.

Trupei's standing to raise this claim is a doubtful matter since he lacks standing to raise the fourth amendment issue. *See United States v. DeLutis*, 722 F.2d 902, 908 (1st Cir.1983). But because the knock-and-announce statute protects interests not identical to those of the fourth amendment (including protection of property), the rules of standing for the two claims may diverge. Since fourth amendment standing was a close issue and Trupei had property inside the apartment, we address the merits of his claim.

escape or destruction of evidence placed the officers into exigent circumstances. *United States v. Harris,* 713 F.2d 623 (11th Cir.1983); *United States v. Tolliver,* 665 F.2d 1005 (11th Cir.), *cert. denied,* 456 U.S. 935, 102 S.Ct. 1991, 72 L.Ed.2d 455 (1982).[3]

▮ Trupei's second objection derives from an alleged violation of his right to a speedy trial. Trupei was arrested on August 3, indicted on August 12, and arraigned on August 23. The jury was selected and impaneled on November 30. The Speedy Trial Act[4] requires that federal criminal trials take place within 70 days of the arraignment, not counting any delays of up to 30 days caused by the filing of a pretrial motion in the case. The appellant, in claiming a statutory violation, has neglected to consider all of the excludable days designated under the statute. Appellant Trupei does not mention his codefendant's motion to return property, filed August 16, or the thirty day period during which the magistrate took that motion under advisement. Nor does he mention the motion to suppress confessions, admissions and statements that was filed on October 6 and ruled upon by the magistrate on November 4. These and numerous other motions filed by the defendants (some of them duplicate motions) make it clear that the district court processed this case quickly and in compliance with the Speedy Trial Act. As for appellant's claim that his constitutional right to a speedy trial was violated, this Court's decision in *United States v. Varella,* 692 F.2d 1352, 1359 (11th Cir.

1982), *cert. denied,* —— U.S. ——, 103 S.Ct. 3542, 77 L.Ed.2d 1392 (1983), requires us to look first to the length of the delay and to continue the constitutional inquiry only if the delay is "presumptively prejudicial." The three and one half month delay in this case, much of it spent in disposing of the defendants' pretrial motions, was not presumptively prejudicial. *United States v. Struyf,* 701 F.2d 875 (11th Cir.1983) (7 month delay not presumptively prejudicial).

▮ In his third assignment of error, Trupei challenges the sufficiency of the evidence to convict him of either of the charges. In evaluating the jury's verdict, this Court should not require that the evidence preclude every reasonable hypothesis of innocence. Rather, we should ask whether any reasonable jury could find that the evidence establishes guilt beyond a reasonable doubt, leaving the jury free to choose among reasonable constructions of the evidence. *United States v. Bell,* 678 F.2d 547, 549 (5th Cir.1982) (Unit B, *en banc*), *aff'd on other grounds,* 462 U.S. 356, 103 S.Ct. 2398, 76 L.Ed.2d 638 (1983). Peterson testified about several highly specific negotiations between himself and Trupei where they discussed quantities, prices and sources of cocaine. At the final meeting, Trupei told Garcia to go and get "the stuff," and seemed to agree when Garcia described the white powder as high quality cocaine. Trupei also went with Peterson to collect the payment for the cocaine. A reasonable jury could readily conclude

---

**3.** It may be that the exigent circumstances necessary to bypass 18 U.S.C.A. § 3109 must be stronger than those which make the fourth amendment's warrant clause inapplicable, because the statute does apply to some warrantless searches. *United States v. Williams,* 573 F.2d 348 (5th Cir.1978). The combination of dangers in this case meets a heightened standard of exigency.

**4.** 18 U.S.C.A. § 3161:
(c)(1) In any case in which a plea of not guilty is entered, the trial of a defendant ... shall commence within seventy days from ... the date the defendant has appeared before a judicial officer of the court ...
\* \* \* \* \* \*

(h) The following periods of delay shall be excluded in computing the time within which ... the trial of any such offense must commence:
(1) Any period of delay resulting from other proceedings concerning the defendant, but not limited to—
\* \* \* \* \* \*
(F) delay resulting from any pre-trial motion, from the filing of the motion through the conclusion of the hearing on, or other prompt disposition of, such motion;
\* \* \* \* \* \*
(J) delay reasonably attributable to any period, not to exceed thirty days, during which any proceeding concerning the defendant is actually under advisement by the court.

from this that Trupei was guilty of the charges against him.

 Finally, Trupei objects to the fact that the trial judge allowed into evidence the hearsay statements of Vukovic. The trial judge admitted the statements after concluding that Vukovic was a co-conspirator whose statements were admissible under Fed.R.Evid. 801(d)(2)(E). Trupei challenges this finding, thus raising a question · similar to a claim of insufficient evidence since under *United States v. James,* 590 F.2d 575, 581 (5th Cir.), *cert. denied,* 442 U.S. 917, 99 S.Ct. 2836, 61 L.Ed.2d 283 (1979), the judge should admit the statements if the other evidence in the case would permit a reasonable jury to find the existence of a conspiracy. The independent evidence against Vukovic begins with the fact that he called Peterson on several occasions. Trupei either called or met with Peterson soon after most of Vukovic's calls. Trupei and Peterson met three times in Vukovic's apartment to discuss the sale of cocaine, twice in his presence. Most significantly, when Peterson asked Trupei how to contact him in the future, Trupei told him to contact Vukovic instead. Vukovic did not object to this arrangement. This evidence is overwhelming when compared with the evidence of a conspiracy in *United States v. Castro,* 723 F.2d 1527 (11th Cir.1984), where the presence of marijuana in and around a residence, the hidden efforts to observe the approach of police officers and the fact that the owner of the house did not know the occupants were there amounted to sufficient evidence of a conspiracy among the occupants. The evidence against Vukovic, by comparison, establishes quite easily his status as a co-conspirator.

 Appellant Garcia raises one objection to his conviction, similar to the last two raised by Trupei. Garcia contends that the May 23 and August 1–3 negotiations constituted two completely separate conspiracies and that Garcia participated only in the last one. As a result, he argues, the trial judge erroneously allowed the jury to consider testimony about the earlier conspiracy as part of the case against Garcia. Because the trier of fact must resolve the issue of whether several activities create one conspiracy or several, *United States v. Brito,* 721 F.2d 743, 747 (11th Cir.1983), we should reverse on this question only if the trial judge was clearly erroneous. The factors that guide our review of this issue are (1) the existence of a common goal, (2) the nature of the plan, and (3) the overlapping of participants. *United States v. Plotke,* 725 F.2d 1303 (11th Cir.1984).

 The goals of the May 18–23 and August 1–3 meetings were identical, the sale of one kilo of cocaine. That is a more specific common goal than the more abstract formulation needed to find a conspiracy in *United States v. Hess,* 691 F.2d 984 (11th Cir.1982) (goal was to increase personal wealth). The plans in May and in August both involved initial contact by Vukovic and negotiations between Peterson and Trupei in Vukovic's apartment. Each time Trupei offered one kilo of cocaine to be followed later by larger sales of four or five kilos. The only terms that changed were those to which Peterson objected in the first negotiations. Furthermore, three of the five men participated in May and August. A delay between transactions or a change in price does not mandate a finding of separate conspiracies. *See, e.g., Hess, supra.* Accordingly, we find that the trial judge was not clearly erroneous in his finding that Garcia joined a single conspiracy begun on or before May 18 of 1983.

The judgment below is AFFIRMED.