**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Daniel J. LEICHTNAM, Defendant–Appellant.**

No. 90–2534.

United States Court of Appeals, Seventh Circuit.

Argued April 9, 1991.

Decided Nov. 21, 1991.

John E. Fryatt, U.S. Atty., Paul Kanter, Asst. U.S. Atty. (argued), Milwaukee, Wis., for plaintiff-appellee.

Margaret Danielson (argued), Madison, Wis., for defendant-appellant.

Before COFFEY and MANION, Circuit Judges, and WILL, Senior District Judge.[*]

WILL, Senior District Judge.

Daniel Leichtnam was tried and convicted on drug conspiracy and firearms charges, 21 U.S.C. §§ 841(a)(1) and 846 and 18 U.S.C. § 924(c), and was sentenced to 13 years and a month in prison plus supervised release. His appeal presents five questions, three of them substantial, begin-

ning with the merits of his unsuccessful motion to suppress the guns and cocaine which the police found in his home.

\* \* \*

Five Waukesha, Wisconsin police officers, carrying a federal search warrant, arrived at the duplex where Daniel Leichtnam was living at six a.m. on October 4, 1990. They tried the screen door on the front porch and, finding it locked, knocked and announced themselves, calling out "Police" in a voice slightly louder than might be used in conversation. They heard no sounds and saw no lights inside, and after 15 seconds they forced the screen door with a crow bar and then walked across the porch to the front door. They knocked there three times, again called out "Police" at the same volume, and waited for a response. Still there was none, and after 20 or 30 seconds more the lead officer gave the go-ahead and a two-man battering ram smashed through the front door. All of this, from the arrival at the screen door to the ram through the locked front door, took more than a minute but less than two.

Inside, just a foot or two away from the front door, the police found a woman in a nightgown and a robe, sitting up, awake, on a couch where she apparently had been sleeping; and in the next room, the dining room, they found Leichtnam, on his feet and zipping up his trousers. These two, and a third woman in a back bedroom, were restrained by some of the officers while the others searched the duplex. In a closet in Leichtnam's bedroom the searching officers found cocaine, paraphernalia used to cut it, prepare it and weigh it and a modified .22 caliber Mossberg rifle in a pool cue case. In other parts of the house they found a pager, a drug ledger, almost $2900 in cash and two handguns.

These are the facts essentially as the magistrate who heard the testimony at the suppression hearing found them. Leichtnam does not challenge them, as recited here, but says that they indicate noncompliance by the Waukesha police with the fed-

[*] The Honorable Hubert L. Will, Senior District Judge of the United States District Court for the Northern District of Illinois, is sitting by designation.

eral "knock and announce" statute, 18 U.S.C. § 3109.

By its terms, section 3109 provides that an officer "may break open ... a house ... to execute a search warrant if, after notice of his authority and purpose, he is refused admittance...." The wording of the statute is deceptive. Section 3109 is a limitation on the authority of law enforcement officers to use force to gain entry and not simply a codification of some of the instances when they "may" do so. *United States v. Salter,* 815 F.2d 1150, 1151–52 (7th Cir.1987). In effect, the word "if" in the statute means "only if." The question here is "Only if *what*?"

The police who searched Leichtnam's home gave notice of their authority but not of their purpose. They identified themselves by calling out "Police." They did not say "Police. We have a warrant." Was that enough? Leichtnam argues that it wasn't, that section 3109 specifically states that the police may force a door only if they have given express notice of both their "authority *and* purpose," not just one or the other, and that the Supreme Court itself took precisely that view in *Miller v. United States,* 357 U.S. 301, 78 S.Ct. 1190, 2 L.Ed.2d 1332 (1958).

In that case, two officers knocked on William Miller's apartment door at 3:45 a.m. When Miller asked "Who's there?", the officers replied, in a low voice, "Police." Miller opened the door a crack, without undoing the chain, and asked the two officers what they were doing. Then, before either one answered, Miller started to close the door on the officers, who may have been in plain clothes and may not have flashed their badges. But before he managed to get the door shut, the officers reached in, ripped the chain off and pushed their way in. Miller was arrested, tried and convicted on drug charges. The Supreme Court reversed his conviction, holding that his arrest was unlawful and that the evidence the police seized after breaking into his apartment should have been suppressed.

Arguably, the decision in *Miller* rests on the Court's conclusion that the officers who knocked on Miller's door not only did not state what they wanted but also did not sufficiently explain who they were. The officers in *Miller* do not appear to have been in uniform and their announcement, "Police," was spoken in a voice so low that Miller may not have heard it. See 357 U.S. at 311, 78 S.Ct. at 1196. Cf. *United States v. Manning,* 448 F.2d 992, 1001 (2d Cir. 1971) (en banc). *Miller* does not, in any event, hold that an announcement of purpose as well as authority must always precede an entry by force. The opinion in *Miller* itself suggests at least one exception to that rigid rule, where announcing purpose would be a "useless gesture" because the occupants already certainly know why the officers are knocking. 357 U.S. at 310, 78 S.Ct. at 1196. And both the "useless gesture" exception and another, for "exigent circumstances," are now firmly ensconced in the case law. See *United States v. One Parcel of Real Property,* 873 F.2d 7, 9–10 (1st Cir.1989); *United States v. James,* 764 F.2d 885, 888 (D.C.Cir.1985); *United States v. Garcia,* 741 F.2d 363, 366 (11th Cir.1984); *United States v. Wysong,* 528 F.2d 345 (9th Cir.1976); *United States v. Wylie,* 462 F.2d 1178 (D.C.Cir.1972); *Manning, supra,* 448 F.2d 992; *Jackson v. United States,* 354 F.2d 980 (1st Cir.1965); 21 A.L.R.Fed. 820 § 9 (1974) and Supp.1990 (collecting cases). See also *Sabbath v. United States,* 391 U.S. 585, 591 & n. 8, 88 S.Ct. 1755, 1759 & n. 8, 20 L.Ed.2d 828 (1968). Neither *Miller* nor subsequent cases interpret section 3109 as a bright line rule closed to any exceptions.

*Miller,* moreover, is not this case. Miller answered his door when the police knocked and asked what they were doing. Leichtnam did not answer the door when the police knocked and identified themselves here. Nor did he shout out "Hold on, coming" or "What do you want?" So far as the Waukesha officers were concerned, either no one was home at Leichtnam's, anyone inside was asleep (which was likely at six o'clock in the morning) or their announcement was being ignored. The police saw no lights and heard no voices and no movement: the magistrate's opinion recommending denial of Leichtnam's motion to

suppress is explicit on that point. To insist under such circumstances that the police must announce that they are executing a warrant (though that *is* what they should do), having already identified themselves as law enforcement officers and drawn no response, would rarely serve any useful purpose, and we do not think that section 3109 requires it. Cf. *One Parcel Of Real Property, supra,* 873 F.2d at 9–10; *Manning, supra,* 448 F.2d at 1000–02; *Bosley v. United States,* 426 F.2d 1257, 1263 (D.C.Cir.1970).

■ There are, undoubtedly, people who will open the door for officers who state they have a warrant but not for officers who don't, which may account for section 3109's reference to purpose in addition to authority. And when it is clear that someone is at home, officers must explain not just who they are but also why they are there. *Miller* is that case. But where, as in this case, officers have knocked and announced "Police," with no answer whatsoever, *and* there are no signs that anyone is home, section 3109 (simply codifying, as it does, common law rules) may be complied with, in spirit at least, even if the officers neglect to state what their business is. See *In the Case of Richard Curtis,* Fost. 135, 168 Eng.Rep. 76 (1756) ("[N]o precise form of words is required ... It is sufficient that the party hath notice, that the officer cometh not as a mere trespasser, but claiming to act under a proper authority.").

■ We said "may" be complied with, and the qualification is an important one. A knock and announcement must be loud enough to be heard, and it must be followed by a pause long enough for someone to answer or come to the door. The police must be "refused admittance." That however, is not a problem here. After a suppression hearing, the magistrate found that the Waukesha police who knocked on Leichtnam's door spoke in a voice "slightly above conversational level" when they called out "Police," which he said was loud enough, and his recommendation was accepted by the district judge. Having heard testimony on the subject, the magistrate was in a better position to evaluate the

situation than we are, and Leichtnam has not called our attention to anything which persuades us that the magistrate's conclusion lacked a substantial basis. The magistrate also found that the police waited twenty to thirty seconds after knocking on the front door before ramming through it. That, however, was more than a minute after the officers had first knocked on the screen door and long enough, given the racket five officers must have made prying open the screen door and marching across the porch, for them to reasonably conclude that they'd been refused admittance. Cf. *United States v. DeLutis,* 722 F.2d 902, 908–09 (1st Cir.1983) (20 seconds) and the cases cited in that opinion. Everyone in Leichtnam's house was apparently aware that the police had been standing outside knocking and wanted in; they were simply ignoring the officers. Though no one inside made any sound or movement to indicate his or her presence or to find out what the police wanted, they had all been awakened, and two of them were out of bed and standing up when the police came in.

Leichtnam's motion to suppress was correctly denied.

\* \* \*

The second question Leichtnam raises is whether the district judge's instructions to the jury and the evidence the government introduced at trial amounted to a constructive amendment to the indictment. *Stirone v. United States,* 361 U.S. 212, 80 S.Ct. 270, 4 L.Ed.2d 252 (1960). As pointed out earlier in the opinion, the police found three guns when they searched Leichtnam's duplex after breaking down his front door—a modified Mossberg rifle and two handguns. Only the Mossberg, however, was charged in the firearms count of the indictment, count two, which alleged that Leichtnam "did knowingly use and carry a firearm, to wit: a Mossberg rifle, Model 250CA with no serial number, during and in relation to ... drug trafficking." The indictment does not refer to the handguns. Yet at trial all three guns and not just the Mossberg were put in evidence, and the jury was instructed that count two hinged on proof simply

that Leichtnam had "intentionally used or carried *a* firearm," not specifically limited to the Mossberg. Leichtnam contends that that instruction, in view of the evidence, was reversible error, per se. See *Stirone*, 361 U.S. at 217, 80 S.Ct. at 273 (Deprivation of "the right to be tried only on charges presented in an indictment and returned by a grand jury ... is far too serious to be treated ... as harmless error.").

■ These contentions, however, were never presented to the district judge. When the handguns were introduced in evidence, Leichtnam's lawyer did not object, and he did not object either to any of the jury instructions or propose his own. Had he done so, the district judge might well have acted to avoid any error. Because he did not, appellate review would ordinarily be limited to a search for "plain" error— *United States v. Keller*, 916 F.2d 628, 636–37 (11th Cir.1990); *United States v. Fountain*, 840 F.2d 509, 515–16 (7th Cir.1988); *United States v. Lemire*, 720 F.2d 1327, 1343 (D.C.Cir.1983)—which implies a mistake so serious that but for it Leichtnam probably would have been acquitted. *United States v. Silverstein*, 732 F.2d 1338, 1349 (7th Cir.1984).

That might have made this an easy case. For if the physical evidence and the instructions had been limited only to the Mossberg, the jury's verdict would almost certainly have been the same. This is not a case where the gun just happened coincidentally to be in the same room as drugs and drug paraphernalia. See, e.g., *United States v. Feliz–Cordero*, 859 F.2d 250, 254 (2d Cir.1988). The police found the Mossberg in the same place as the cocaine and drug paraphernalia in the closet in Leichtnam's bedroom and there was testimony, in addition, that Leichtnam had made sales from his home. That much evidence might very well have been enough to support a conviction under 18 U.S.C. § 924(c). Cf. *United States v. Torres–Medina*, 935 F.2d 1047 (9th Cir.1991); *United States v. Townley*, 929 F.2d 365, 368–69 (8th Cir. 1991); *United States v. Hadfield*, 918 F.2d 987, 996–98 (1st Cir.1990).

■ The government, nevertheless, does not argue in its brief, and did not contend at oral argument, that Leichtnam has waived the introduction of the guns and the firearm instruction by not objecting to them at trial. Perhaps the government figured that by making the argument and highlighting Leichtnam's waiver, to show that the issue had not been preserved (along with others in this case), it might lead us to conclude that Leichtnam's trial counsel had been ineffective. But whatever its reasoning the government has now waived waiver as a defense. And its waiver leaves us to confront Leichtnam's argument on the merits and without the screen of the plain error standard. See *United States v. Dunkel*, 927 F.2d 955 (7th Cir. 1991); *United States v. Malin*, 908 F.2d 163, 167 (7th Cir.1990); *Garlington v. O'Leary*, 879 F.2d 277, 282–83 (7th Cir. 1989).

Parties, prosecutors included, should select the arguments they do and don't make with great care. See *Wilson v. O'Leary*, 895 F.2d 378, 384 (7th Cir.1990) (affirming the grant of a writ of habeas corpus) ("Astoundingly, the state did not mention harmless error in its opening brief ... Procedural rules apply to the government as well as to defendants. [The state] has forfeited what would have been its best argument. If as a result a violent offender goes free, the Attorney General ... must understand where the responsibility lies—with his own staff.").

\* \* \*

The fifth amendment guarantees that "No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury"—from which it follows that felony charges must be framed by a grand jury and that a defendant may be tried for a felony only on the charges the grand jury approved, as it approved them, and no others. It is the exclusive prerogative of the grand jury finally to determine the charges, and once it has done so neither a prosecutor nor a judge can "change the charging part of an indictment to suit [his or her] own notions of what it ought to

have been, or what the grand jury would probably have made it if their attention had been called to suggested changes." *Ex parte Bain*, 121 U.S. 1, 10, 7 S.Ct. 781, 786, 30 L.Ed. 849 (1887). If an indictment could be so lightly departed from, then "the great importance which the common law attaches to an indictment by a grand jury, as a prerequisite to a prisoner's trial for a crime, and without which the Constitution says 'no person shall be held to answer,' [might] be frittered away until its value is almost destroyed...." *Id.*

■ The settled rule, therefore, is that an indictment may not be "amended except by resubmission to the grand jury." *Russell v. United States*, 369 U.S. 749, 770, 82 S.Ct. 1038, 1050, 8 L.Ed.2d 240 (1962). There are, however, two categories of established exceptions to that rule or, perhaps more precisely, two categories of departures or variances from the charges in an indictment that do not constitute "amendments."

The first category covers variations from the charges that are "merely a matter of form," *Russell, supra,* 369 U.S. at 770, 82 S.Ct. at 1050. An indictment may be modified, either physically or constructively (because the evidence or the jury instructions effectively "amend" it) to correct for a typographical or clerical error or a misnomer. See generally *United States v. Kegler,* 724 F.2d 190, 193–95 (D.C.Cir.1984); *United States v. Bush,* 659 F.2d 163 (D.C.Cir.1981). In addition, unless the particular date is an important element of the charged offense, see *United States v. Goldstein,* 502 F.2d 526 (3d Cir.1974), a formal change to the date specified in the indictment (or proof or instructions that the charged crime was committed on a different date than the indictment alleges) will not impermissibly amend the indictment— so long, in general, as the evidence shows that the offense was the one charged and that it was committed on a date before the indictment and within the statute of limitations. *United States v. Leibowitz,* 857 F.2d 373, 378–79 (7th Cir.1988). Cf. *United States v. Cina,* 699 F.2d 853 (7th Cir.1983). Also, an inconsistency between the proof

and the charges amounting to no more than a simple matter of semantics will not always constitute an amendment—provided that any difference between the two does not result in making a conviction possible on bases that the grand jury did not charge. See *United States v. Jungles,* 903 F.2d 468, 475–77 (7th Cir.1990). Cf. *United States v. Bledsoe,* 898 F.2d 430, 432 (4th Cir.1990).

The second recognized exception to the prohibition against amending an indictment is that an indictment has not been "amended" if all that has happened is that the evidence or the charges submitted to the trial jury wind up being simply a more limited version of the charges in the indictment. An indictment may be narrowed, either constructively or in fact, without resubmitting it to the grand jury.

The most common example of a harmless narrowing of an indictment is when one count of a multi-count indictment is withdrawn from the trial jury's consideration while the others are still submitted for its verdict. Nothing about that practice detracts from the right to a grand jury. See *Dealy v. United States,* 152 U.S. 539, 542, 14 S.Ct. 680, 681, 38 L.Ed. 545 (1894).

The same is also true, moreover, when a single count of an indictment charges more than one commission of the same offense (or more than one way of committing it), yet either the evidence, the instructions to the jury or both cover only one—or the indictment is physically amended to charge only one. *United States v. Miller,* 471 U.S. 130, 140–45, 105 S.Ct. 1811, 1817–20, 85 L.Ed.2d 99 (1985). See also *Ford v. United States,* 273 U.S. 593, 47 S.Ct. 531, 71 L.Ed. 793 (1927); *Salinger v. United States,* 272 U.S. 542, 47 S.Ct. 173, 71 L.Ed. 398 (1926); *United States v. Muebl,* 739 F.2d 1175, 1180–81 (7th Cir.1984); *United States v. Lemire, supra,* 720 F.2d at 1343–46. An example of an allowable change of this sort would be the narrowing of an indictment that charges fraud against "the Comptroller of the Currency and the agent ... [of a federally organized] bank." The words *"the Comptroller of the Currency and"* may permissibly be taken out with-

out going back to the grand jury. *United States v. Miller, supra,* 471 U.S. at 140–45, 105 S.Ct. at 1817–20 (explaining *Ex parte Bain, supra,* and disowning *Bain*'s broadest implications). What is left when those words are taken out, a charge of defrauding an agent of a federally organized bank, is something less than what the grand jury charged—defrauding the Comptroller of the Currency *and* an agent of a federally organized bank. But it is still a criminal offense and one that the grand jury clearly set out in its indictment. No offense not charged in the original indictment has been added, and no possible basis for conviction not contained in the original indictment has been created.

Another example of an allowable narrowing would be to an indictment that charges a conspiracy or scheme and describes, in detail, the roles of each of the coconspirators and the story of the scheme. If the evidence at trial turns out not to prove every single fact set out in the indictment, but still proves the same conspiracy or scheme as outlined in the indictment, or a somewhat smaller version of it (but not a different conspiracy or scheme), and also proves the same criminal acts as charged in the indictment, or a subset of them, the right to a grand jury has not been denied—not by the difference between the evidence and the details in the indictment and not by instructions that require proof of each essential element of every charge submitted to the jury but do not demand proof of every single fact in the indictment. *United States v. Williams,* 798 F.2d 1024, 1030–33 (7th Cir.1986); *United States v. Kuna,* 760 F.2d 813, 817–19 (7th Cir.1985). And, similarly, if the indictment charges a conspiracy and lists overt acts, but it's not necessary to prove the overt acts to prove the conspiracy (as would be the case under 21 U.S.C. § 846), then jury instructions that do not demand proof of the overt acts do not impermissibly amend the indictment. *United States v. Franco,* 874 F.2d 1136, 1144 (7th Cir.1989); *Williams, supra,* 798 F.2d at 1032.

■ To generalize from these examples, a conviction will not ordinarily be upset because the proof at trial or the jury instructions cover fewer offenses than the indictment charged or only narrower or "lesser included" offenses—at least not without specific evidence that any departure from the strict terms of the indictment either surprised the defendant and prejudiced his or her defense or created a risk of double jeopardy. See *Kuna, supra,* 760 F.2d at 819; *United States v. Davis,* 679 F.2d 845, 851–52 (11th Cir.1982). See also *Berger v. United States,* 295 U.S. 78, 82, 55 S.Ct. 629, 630, 79 L.Ed. 1314 (1935).

■ The corollary of all this, however, is that though an indictment may be *narrowed,* so that the trial jury deliberates on fewer offenses than the grand jury charged, it may not be *broadened,* so as to present the trial jury with more or different offenses than the grand jury charged. Any "broadening [of] the possible bases for conviction from that which appeared in the indictment," *United States v. Miller, supra,* 471 U.S. at 138, 105 S.Ct. at 1816, is fatal. It is reversible per se. *Stirone, supra,* 361 U.S. at 217, 80 S.Ct. at 273.

Consequently, if an indictment charges a RICO conspiracy among individuals "associated with an enterprise, to wit ... the DeCavalcante Family of La Cosa Nostra," the jury must be instructed that to convict the defendants it has to find, not merely that they were associated with just any enterprise, as "enterprise" is defined in 18 U.S.C. § 1961(4), but specifically that the enterprise the defendants were associated with was the DeCavalcante family. For the more general instruction would allow the defendants to be convicted of an enterprise other than the one charged in the indictment, violating their right to be tried only on the charges approved by the grand jury—even though proof of an "enterprise," as defined by the RICO statute, in no way hinges on the particular identity of the members of the enterprise and even though a conviction might have been possible under an indictment that had simply tracked the general language of the statute to describe the enterprise, rather than specifying "an enterprise, to wit ... the DeCavalcante Family." When included in the

indictment, the words "to wit ... the DeCavalcante Family" become an essential element of the charge. See *United States v. Weissman,* 899 F.2d 1111 (11th Cir.1990). See also *United States v. Keller,* 916 F.2d 628, 632–36 (11th Cir.1990).

In the same fashion, if an indictment charges a defendant with inducing two particular women, named in the indictment, to engage in prostitution, the identities of those two women are not surplusage. Though the evidence at trial deals with the defendant's relationships not only with those two women but also with others, the jury must be instructed that to convict it has to be satisfied with the evidence regarding the two named women. The defendant may not be convicted of inducing prostitution generally if the indictment charges, specifically, that he induced two women in particular. See *Howard v. Daggett,* 526 F.2d 1388 (9th Cir.1975). And, if an indictment charges use of a "false, fictitious and misrepresented identification, that is a Mississippi driver's license ... in that Ernest Adams represented that he was Ernest Cole," then the charge is for using a false name. Though the defendant may have used both a false name and a false address, the indictment does not say that, and though the evidence introduced at trial may be sufficient to support a conviction for using a false name, if evidence is also introduced about the false address and the jury instructions make reference both to "identity and address," then a possible basis for conviction not set out in the indictment, falsification of address, has been added to the only basis that was set out in the indictment, falsification of name. The result is an impermissible constructive amendment to the indictment and reversal is automatic. *United States v. Adams,* 778 F.2d 1117 (5th Cir.1985). But cf. *United States v. Knuckles,* 581 F.2d 305 (2d Cir. 1978) (though the indictment specified heroin, an instruction telling the jury "that it is of no legal significance" if "you find that the substance was not heroin but was cocaine" was not an impermissible amendment, where it was the defense, not the prosecution, that introduced evidence of cocaine and there was no prejudice).

The classic case of an impermissible broadening of the charges is *United States v. Stirone, supra,* 361 U.S. 212, 80 S.Ct. at 270. Stirone was tried for unlawfully interfering with interstate commerce in violation of the Hobbs Act under an indictment that charged that he had obstructed interstate shipments of sand by extortion. At trial, however, the government's proof went beyond the allegation in the indictment that he had obstructed shipments in sand. The government also tried to prove that Stirone had obstructed steel shipments, and the jury was instructed that a guilty verdict could rest on proof that he had obstructed shipments of either sand or steel. Stirone was convicted.

There was no question but that the evidence was sufficient to sustain a verdict for obstruction of the sand shipments, as the circuit court's opinion had made clear. *United States v. Stirone,* 262 F.2d 571, 575 (3d Cir.1958). But the sufficiency of that evidence could not sustain the conviction, the indictment having been "amended," and the Supreme Court reversed Stirone's conviction, stating that:

> ... [A] court cannot permit a defendant to be tried on charges that are not made in the indictment against him. Yet the court did permit that in this case. The indictment here cannot fairly be read as charging interference with movements of steel.... And it cannot be said with certainty that with a new basis for conviction added, Stirone was convicted solely on the charge made in the indictment the grand jury returned. Although the trial court did not permit a formal amendment of the indictment, the effect of what it did was the same. And the addition charging interference with steel exports is neither trivial, useless, nor innocuous.... [T]he variation between pleading and proof ... destroyed the defendant's substantial right to be tried only on charges presented in an indictment returned by a grand jury. Deprivation of such a basic right is far too serious to be ... dismissed as harmless error. The very purpose of the requirement that a man be indicted by grand

jury is to limit his jeopardy to offenses charged by a group of his fellow citizens acting independently of either prosecuting attorney or judge.

... [T]here are two essential elements of a Hobbs Act crime: interference with commerce, and extortion ... [W]hen only one particular kind of commerce is charged to have been burdened a conviction must rest on that charge and not another, even though it be assumed that under an indictment drawn in general terms a conviction might rest upon a showing that commerce of one kind or another had been burdened ... [W]e cannot know whether the grand jury would have included in its indictment a charge that commerce in steel ... had been interfered with. Yet because of the court's admission of evidence under its charge this might have been the basis upon which the trial jury convicted [Stirone]. If so, he was convicted on a charge the grand jury never made against him. This was fatal error.

361 U.S. at 217–19, 80 S.Ct. at 274.

■ The grand jury clause of the Constitution requires that proof and jury instructions must be for crimes that were "clearly and fully set out in the indictment" as returned by the grand jury. *United States v. Miller, supra,* 471 U.S. at 136, 105 S.Ct. at 1815. The possible bases for conviction are limited to those contained in the indictment. *Id.* at 138, 105 S.Ct. at 1816. New ones may not be added without resubmitting the indictment to a grand jury, whether they are added literally, by a formal amendment to the indictment, e.g., *Bain, supra,* 121 U.S. 1, 7 S.Ct. 781, or constructively—by proof at trial of a crime not clearly and fully charged (though with allowances for Fed.R.Evid. 404(b)) or by instructions to the trial jury which would allow a conviction on grounds not charged by the grand jury. See *Keller, supra,* 916 F.2d at 632–36; *United States v. Weissman, supra,* 899 F.2d 1111; *United States v. Zingaro,* 858 F.2d 94 (2d Cir.1988); *United States v. Adams, supra,* 778 F.2d 1117;

*United States v. Figueroa,* 666 F.2d 1375, 1379 (11th Cir.1982); *United States v. Salinas,* 654 F.2d 319, 322–25 (5th Cir.1981); *United States v. Carlson,* 616 F.2d 446 (9th Cir.1980); *Howard v. Daggett, supra,* 526 F.2d 1388.

\* \* \*

■ Leichtnam was indicted for having "knowingly use[d] and carr[ied] a firearm: to wit, a Mossberg rifle...." Yet that may not be what he was convicted of. The grand jury charged him, in count two, with having used one particular gun, the Mossberg. But the trial jury was shown three guns, not just the Mossberg, and then received an instruction, tendered by the government, that it could convict on count two if convinced that Leichtnam had used "a firearm"—in effect, any one of the three. The introduction of the two handguns in addition to the Mossberg, combined with the instruction on count two, plainly told the trial jury that a conviction could rest on proof that Leichtnam had used or carried "a" firearm, whether or not it was the Mossberg specified in the indictment, and made it possible for the trial jury to convict Leichtnam on charges which the grand jury never made against him. In the context of the entire jury charge and the entire trial, the introduction of three guns, where only one had been charged, together with the faulty instruction on count two, destroyed Leichtnam's fifth amendment right to be tried only on the charges contained in his indictment.

Obviously, the government could easily have drawn up Leichtnam's indictment to charge him simply with having used or carried "a firearm." But it did not do so, and the description it gave of the gun in the indictment, "to wit a Mossberg rifle, Model 250CA with no serial number," was not merely surplusage. That is true as a matter of law. By the way the government chose to frame Leichtnam's indictment, it made the Mossberg an essential part of the charge and limited the bases for possible conviction to the Mossberg.[1]

---

1. See *Stirone, supra,* 361 U.S. at 218, 80 S.Ct. at 273 (conviction reversed because evidence and instructions would have permitted conviction based on obstruction of shipments in steel not

The government's decision to limit the indictment to the Mossberg (and no other guns) was, furthermore, a deliberate one. The Assistant United States Attorney who drew up the indictment and tried the case told us at oral argument that he purposefully did not charge the two handguns he introduced at trial. He said that he "felt that they were sufficiently attenuated from the drug evidence that it would be inappropriate to charge [Leichtnam] with those two guns." That may have been a commendable exercise of prosecutorial discretion. But if the AUSA felt that he didn't have evidence to connect the handguns to a drug transaction under section 924(c), then he should not have introduced them and tendered a jury instruction which allowed the jury to make that connection.[2]

None of this, it bears noting, need have been any problem. If the AUSA had drafted a broader, less specific indictment; if he had not introduced the two handguns into evidence, after deliberately deciding not to charge them; and if he had tendered an instruction limited to the Mossberg, as he

should have, then he would probably have a conviction now. Because he drafted the indictment the way he did, but then, nonetheless, introduced the handguns at trial, even though he didn't think he had evidence that they had been used or carried during a drug transaction; and because he tendered an instruction charging Leichtnam with having used or carried simply "a" firearm and the district judge gave that instruction—all, inexplicably, without any objection from Leichtnam's lawyer—now there is a problem.

As presented to and returned by the grand jury, the indictment specified a single, narrow basis for conviction on count two—Leichtnam's knowingly using or carrying the Mossberg rifle during and in relation to drug trafficking. But the charge to the jury was not limited to the Mossberg. It referred merely to "a" firearm, and there is no way now of knowing if the jury convicted Leichtnam of using or carrying the Mossberg or the handguns or all of them.[3] The introduction of the hand-

sand); *Weissman, supra,* 899 F.2d 1111 (indictment specified that the RICO enterprise was the DeCavalcante family; conviction might have rested on proof of any "enterprise"); *Adams, supra,* 778 F.2d 1117 (indictment specified using a false name; conviction might have been for using a false address); *Salinas, supra,* 654 F.2d at 322–25 (indictment specified aiding and abetting a bank president in the misapplication of bank funds; conviction might have been for aiding and abetting any bank "officer, director or employee"); *Carlson, supra,* 616 F.2d 446 (indictment specified misapplying bank funds by causing a loan to be made for personal use; conviction might have been for misapplying bank funds by causing a loan to be made knowing that it was insufficiently secured and concealing that fact from the bank); *Howard, supra,* 526 F.2d 1388 (indictment specified inducing two named women to engage in prostitution; conviction might have been for inducing other women to engage in prostitution).

But, also compare *Salinas, supra,* with *United States v. Von Stoll,* 726 F.2d 584, 586–87 (9th Cir.1984) (though the indictment specified that the defendant took money from one partner, while the proof showed that he got it from another, the inconsistency did not warrant a reversal). And see *United States v. Knuckles, supra,* 581 F.2d 305 (though the indictment specified heroin, an instruction telling the jury "that it is of no legal significance" if "you find that the substance was not heroin but was co-

caine" was not an impermissible amendment, where it was the defense, not the prosecution, that had introduced evidence of cocaine and there was no prejudice).

2. The dissent states that the evidence presented on the handguns was not "distinctly different" from that on the rifle charged in the indictment, and thus this case is not like *Stirone.* The AUSA, however, obviously considered them distinctly different when he made his conscious decision that to charge the two handguns would be inappropriate, and we agree. The evidence on the rifle was significantly different from that on the handguns. The rifle was found in a closet which also contained narcotics and drug paraphernalia. The handguns were in another part of the house. But a government witness, the defendant's former girlfriend, testified that he carried a gun, obviously a handgun and not a rifle, in the saddle bag of his motorcycle when he delivered narcotics. On the other hand there was no evidence that the rifle was actually used in a narcotics transaction.

3. The dissent also states that "In all probability, Leichtnam's conviction was based only on the evidence introduced as to the Mossberg rifle." There obviously is no evidence as to the jury's thinking on which to base such a speculative conclusion. Evidence was introduced about two handguns and the rifle. Then the jury was erroneously instructed that it could convict if it

guns, together with the jury instructions, impermissibly amended the indictment—by broadening the possible bases for conviction to include knowingly using or carrying *any* firearm. That was clear error, and Leichtnam's firearm conviction on count two must be reversed.[4]

\* \* \*

■ The third question Leichtnam raises on appeal goes to the sufficiency of the evidence showing his membership in a conspiracy. It was sufficient. There was testimony at trial, for instance, that Leichtnam and Thomas Alvarez discussed taking a trip together to buy large amounts of cocaine, and there was also testimony that when Alvarez had a customer, but was out of cocaine, he would take the customer's money, go in a back room with Leichtnam and then come back with cocaine for the sale. From that evidence, the jury could easily have found a conspiracy to possess and distribute, with Leichtnam and Alvarez, at least, as coconspirators.

The fourth challenge Leichtnam brings is to the basis for his sentence on count one for possession with intent to distribute. The jury returned a special verdict on count one, finding that Leichtnam was part of a conspiracy to distribute "more than 500 grams" of cocaine (the only alternative on the verdict form being "less than 500 grams"). Following that verdict, his sentence should properly have been based on the amounts the evidence showed he personally possessed and intended to distribute, together with any amounts that his coconspirators possessed and did or intended to distribute and which he knew about or reasonably should have anticipated. Guidelines § 1B1.3, n. 1. The total for which he was accountable might well add up to more than 500 grams, and permissibly so, but not without some basis and explanation.

The sentence Leichtnam received on count one was for 97 months, which would be a lawful sentence for at least 3.5 but less than 5 kilograms of cocaine. How that sentence was computed, however, is not clear from the record. Amazingly, the quantity of cocaine on which the sentence was based was never mentioned during the sentencing proceedings.

There is a bald statement in Leichtnam's presentence report that "[t]he government indicates Mr. Leichtnam was responsible for approximately four kilograms of cocaine," and we might assume, as the parties seem to, that that statement formed the basis for Leichtnam's sentence. But if so, the implications would be troubling.

■ The presentence reports that are prepared by the Probation Office, almost always with help from the prosecutor on the case, are meant to guide trial judges in sentencing. But they must not be taken for gospel. The exact sentence ultimately to be imposed and the basis for it are the responsibility not of the United State's Attorney's office or the Probation Office but of the court itself, and while presentence reports should be a helpful source of information to judges, they are to be weighed

found the defendant had used a firearm, in effect any of the three firearms. Mathematically, there is at most only a one in three chance that the conviction was properly based on the rifle and not improperly based on either or both of the handguns. Given the evidence that Leichtnam carried a handgun, not a rifle, when he delivered narcotics plus the erroneous instruction, the probability is that Leichtnam's conviction was *not* based only on the Mossberg rifle evidence.

4. The dissent's final assertion is that, "To upset a jury's verdict without firm support in precedent undermines public confidence in the criminal justice system and feeds the common and justifiable perception that too many guilty defendants evade justice by invoking legal technicalities."

That should not be the case here. Leichtnam remains convicted and faces a substantial period of incarceration on the count of which the jury properly found him guilty and not guilty only on the count of which he was convicted in violation of the fundamental grand jury and indictment requirements of the Fifth Amendment. This should strengthen, not weaken, public confidence in our system of justice. In any event, public opinion is not properly the determinative factor in judicial decisions. The founding fathers were well aware when they adopted the amendments constituting the Bill of Rights that their application would sometimes be unpopular. It is the responsibility of the judiciary to uphold the Constitution even when to do so may not be approved by the majority of the public.

by the judge like any other source of information.

Leichtnam's presentence report was, to say the least, a poor source for estimating the quantity of cocaine for which he might be held accountable. All his PSI report says is that an Assistant United States Attorney told the probation officer preparing the presentence report that the government believed that approximately four kilograms was the right figure. There is no basis given for that conclusion. Why not three kilograms? Or five? These are obvious questions, but no less crucial for being obvious. A finding of either three kilograms or five rather than four would have meant a different sentence for Leichtnam. The PSI report, nonetheless, gives no reasons for the four kilogram figure—that "the government indicates Mr. Leichtnam was responsible for approximately four kilograms of cocaine" is not a reason; it is not even a conclusion. If the report had been expressly adopted by the district judge, which it wasn't, it still would not have sufficiently explained his sentence.

 In what he actually said in explaining Leichtnam's sentence on count one, the district judge was curt. "In this case I find no reason to go either above or below the guidelines on count one.... On count one it is the sentence of the court that Mr. Leichtnam be committed to the custody of the Attorney General for a period of 97 months." That was too curt. Cf. *United States v. Durrive*, 902 F.2d 1221, 1231–32 n. 8 (7th Cir.1990). A court in imposing sentence must give reasons, explaining, at the very least, how it computed a base offense level and guideline range and arrived at the sentence it did. *United States v. McDowell*, 918 F.2d 1004, 1012 (1st Cir.1990); *United States v. Lockard*, 910 F.2d 542, 546 (9th Cir.1990); 18 U.S.C. § 3553. In a drug case, that necessarily means making a finding about the quantity of drugs for which the defendant is being held accountable. The sentence depends in large part on the quantity. Nonetheless, quantities were never mentioned at Leichtnam's sentencing hearing.

The AUSA proposed a prison term on count one of a period of months, specifically 102 months. ("I don't know why the guideline people came up with odd numbers like 97 months ... Odd numbers just bother me. So I would recommend ... a period of 102 months."). Leichtnam's attorney proposed a shorter period, 90 months, which would have required a finding of less than 3.5 kilos, and the district judge settled on a term in between. But in all this, no quantities were mentioned by anyone, and it is impossible to tell from the record as it stands whether the sentence given, of 97 months, which would correspond to a quantity of somewhere between 3.5 and 5 kilos of cocaine, was a correct application of the Guidelines or not. This failure requires a remand for resentencing. On remand, care should be taken to make sure that Mr. Leichtnam has had an opportunity to read and discuss his PSI report with counsel, including the suggestion in that report that he knew or reasonably should have foreseen that the conspiracy of which the jury found him to be a member involved "approximately four kilos" of cocaine. See *United States v. Rone*, 743 F.2d 1169 (7th Cir.1984).

\* \* \*

 The fifth and last challenge Leichtnam brings is to his lawyer's performance at trial. We reject his suggestions that his lawyer was ineffective. His lawyer's performance left a lot to be desired, but because the jury's verdict would in all likelihood have been the same, even if his lawyer had been better, Leichtnam was not prejudiced.

To sum up, Leichtnam's conviction on count one for participation in a drug conspiracy is affirmed, but the sentence on count one is vacated and the case is remanded for resentencing. Leichtnam's conviction on the section 924(c) firearms charge in count two is reversed.

COFFEY, Circuit Judge, concurring in part and dissenting in part.

I join the majority in upholding the drug conspiracy conviction of defendant Daniel J. Leichtnam. I also join in vacating the

drug conspiracy sentence and in remanding it for resentencing because the trial judge failed to make a finding about the quantity of drugs upon which he based the sentence. I dissent, however, as to the reversal of his firearms conviction.

## I. DISCUSSION

Leichtnam was convicted of a firearms charge under 18 U.S.C. § 924(c) which provides, in pertinent part, for the imprisonment for five years of any person who uses or carries a firearm during and in relation to any drug trafficking crime. The firearms indictment against Leichtnam charged that the defendant did "knowingly use and carry a firearm, to wit: a Mossberg rifle, Model 250CA with no serial number, during and in relation to a drug trafficking scheme...."

The majority properly concludes that substantial evidence was presented at trial establishing that the defendant violated 18 U.S.C. § 924(c) as to the Mossberg rifle. "This is not a case," the majority states, "where the gun just happened coincidentally to be in the same room as drugs and drug paraphernalia.... The police found the Mossberg in the same place as the cocaine and drug paraphernalia in the closet in Leichtnam's bedroom and there was testimony, in addition, that Leichtnam had made sales from his home. That much evidence might very well have been enough to support a conviction under 18 U.S.C. 924(c)."

Despite this evidence, the majority, for reasons not based in current case law, reverses the defendant's firearm conviction. The majority arrives at this result by accepting the defendant's spurious claim that the judge, through his instructions, and the prosecutor, with his submission of evidence of the defendant's use of two handguns (evidence which was properly received after denial of a motion to suppress), combined to constructively amend the firearm indictment.

As a threshold matter, I am unconvinced that it is appropriate for the court to address the defendant's constructive amendment argument. *Defendant's counsel*

*failed to object during the trial to the introduction of the handguns, failed to object to the allegedly erroneous jury charge and failed to make a motion at the close of the trial for acquittal on the firearms charge based on the alleged constructive amendment of the indictment.* As the majority states, in these circumstances, "appellate review would ordinarily be limited to a search for 'plain' error ... which implies a mistake so serious that but for it Leichtnam probably would have been acquitted" (citations omitted). I agree with the majority's assertion that "plain error" review would have made "this an easy case. For if the physical evidence and the instructions had been limited only to the Mossberg, the jury's verdict would almost certainly have been the same."

Nevertheless, the majority refuses to exercise its discretion to uphold the jury verdict by applying the obvious "plain error" standard and concludes that the government "waived waiver as a defense" by failing to make the waiver argument in its appellate brief. Although it is true that we normally refuse to consider arguments not presented (*see, e.g., Garlington v. O'Leary,* 879 F.2d 277, 282–83 (7th Cir.1989); *Andrews v. United States,* 817 F.2d 1277, 1278–79 n. 1 (7th Cir.), *cert. denied,* 484 U.S. 857, 108 S.Ct. 166, 98 L.Ed.2d 120 (1987)), it is within our discretion to consider such arguments when to do so is in the interests of justice. Because Leichtnam's firearms conviction was supported by overwhelming evidence I am at a loss to understand why the majority, if it is convinced that the trial judge committed error, does not exercise its discretion and consider any error harmless. Moreover, the fact that defendant's counsel failed to object to the introduction of the evidence, failed to object to the jury charge, and failed to make a motion for acquittal on the firearm charge after the return of the guilty verdict, provides more than ample reason to consider the constructive amendment argument waived in spite of the fact that the government did not believe that the trial court committed error and thus did not raise the issue of waiver in its appellate

brief. Instead, the government argued that the novel constructive amendment issue raised for the first time on appeal lacked merit.

Moreover, I am in complete disagreement with the majority's underlying assumption that the handguns were improperly received in evidence. The government chose to present the evidence of the handguns in its proof of the drug conspiracy for which Leichtnam was tried and convicted. This is a perfectly legitimate basis for the admission of the evidence. In *United States v. Alvarez*, 860 F.2d 801 (7th Cir.1988), *cert. denied*, 490 U.S. 1051, 109 S.Ct. 1966, 104 L.Ed.2d 434 (1989), we considered a challenge to the admission of a gun as evidence of its owner's involvement in a drug conspiracy. The defendant [Ms. Rivera] had argued that the gun, which was discovered by police along with cocaine and drug paraphernalia during a valid search, was irrelevant to the drug conspiracy charge and unduly prejudicial. We rejected both arguments, observing that:

> "Experience on the trial and appellate benches has taught that substantial dealers in narcotics keep firearms on their premises as tools of the trade almost to the same extent as they keep scales, glassine bags, cutting equipment and other narcotics equipment." *United States v. Wiener*, 534 F.2d 15, 18 (2d Cir.), *cert. denied*, 429 U.S. 820, 97 S.Ct. 66, 50 L.Ed.2d 80 (1976).
>
> . . . .
>
> We find no reason to disturb the court's sound exercise of discretion in admitting the pistol. As the government points out, the gun was not cumulative evidence; it raised the inference that the cocaine was valuable to Ms. Rivera and, therefore, worth protecting. We cannot construe the admission of the weapon as confusing the jury.

*Alvarez*, 860 F.2d at 829, 830. Given the deference that trial judges are accorded in evidentiary decisions, it would be inappropriate for this court to question the admis-

sion of the handguns evidence. *See United States v. Garver*, 809 F.2d 1291, 1297 (7th Cir.1987) ("The district court has broad discretion to determine the admissibility of evidence, and ... *we will reverse the court's evidentiary rulings only upon a clear showing of abuse of discretion.*" (citations omitted) (emphasis added)). Thus, the receipt of the handguns evidence was entirely proper when establishing Leichtnam's involvement in the drug conspiracy. *See, also, United States v. Edwards*, 885 F.2d 377, 389 (7th Cir.1989) (holding that during a search the "police could reasonably have believed that [firearms] were part of the suspected cocaine dealing operation").

Even considered on its merits, however, Leichtnam's constructive amendment argument does not warrant reversal of his firearms conviction. According to the majority's reasoning, the constructive amendment occurred in two steps. First, the prosecution introduced evidence that the defendant violated § 924(c) by using handguns (in addition to the Mossberg rifle) in connection with his drug trafficking scheme.[1] The prosecution presented as exhibits two handguns found in the defendant's home during the same search which uncovered the Mossberg rifle. The handguns were found in the same room as the rifle. The majority raises no questions about the legality of that search.

Having allowed evidence of these two handguns to be received, the trial judge, according to the majority, committed a reversible error when he gave the jury the following instruction on the firearms charge:

> [I]n order to establish that crime the government must prove the following propositions. First, that the defendant committed the [cocaine possession and distribution] conspiracy charged in Count 1. Two, that the defendant intentionally used or carried a firearm and; Three that this firearm was used or carried during and in relation to the conspiracy.

---

1. Brenda Frick, the defendant's former girlfriend, testified that she accompanied Leichtnam on several cocaine sale and delivery trips and that Leichtnam kept a handgun in a compartment of the motorcycle he operated from during these drug transactions.

The majority asserts that, given the introduction of evidence as to other guns, the judge's failure to specify in his charge that the firearms indictment pertained only to the Mossberg rifle amounted to a constructive amendment of the indictment, even though the defense counsel did not object to the instructions much less request and/or offer any modification. The majority cannot properly reach this conclusion by applying controlling legal precedent.

The controlling Supreme Court pronouncement in the area of constructive amendments of indictments, as the majority recognizes, is *Stirone v. United States,* 361 U.S. 212, 80 S.Ct. 270, 4 L.Ed.2d 252 (1960). In *Stirone,* the Supreme Court held that events at trial can effectively amend an indictment, requiring reversal of a conviction, even in the absence of a formal amendment. *Stirone* involved an indictment which alleged that the defendant unlawfully interfered with the movement of sand in interstate commerce in violation of the Hobbs Act. The sand in question was to be transported into Pennsylvania and used in the construction of a steel-processing plant. The district court, however, permitted the government to offer evidence of an effect upon interstate commerce not only with respect to sand, but also with respect to steel shipments leaving the Pennsylvania plant. Steel, of course, is a commodity entirely separate and distinct from sand. No mention of interference with the transportation of another separate and distinct commodity such as steel was made in the indictment. Nevertheless, the jury was instructed that, as to the interstate commerce aspect of the Hobbs Act violation, the defendant's guilt could be based either on a finding of an effect on the interstate movement of sand into Pennsylvania or a finding that the sand in question was used in the construction of the steel plant whose shipments would later move in interstate commerce.

The *Stirone* Court, in concluding that the indictment had been impermissibly amended, held that

> [A] court cannot permit a defendant to be tried on charges that are not made in the indictment against him.... Yet the

court did permit that in this case. The indictment here cannot fairly be read as charging interference with movements of steel from Pennsylvania to other States.... The grand jury which found this indictment was satisfied to charge that Stirone's conduct interfered with interstate importation of sand. But neither this nor any other court can know that the grand jury would have been willing to charge that Stirone's conduct would interfere with interstate exportation of steel.... And it cannot be said with certainty that with a new basis for conviction added, Stirone was convicted solely on the charge made in the indictment the grand jury returned.

*Stirone,* 361 U.S. at 217, 80 S.Ct. at 273 (citations omitted).

This variation between the indictment on the one hand and the evidence presented and the jury charge on the other, the Supreme Court concluded, "destroyed the defendant's substantial right to be tried only on charges presented in an indictment returned by a grand jury." *Id.*

The majority in this case, in reaching out to achieve the result it does, somehow concludes that the circumstances of Leichtnam's conviction are analogous to those found in *Stirone. They are not.* In the case at issue before us, we have a jury charge, approved by both counsel before it was delivered, which referred to "a firearm" (*both rifles and revolvers are classified as firearms*) and an indictment and conviction supported by overwhelming evidence of possession of the specific Mossberg rifle charged in the indictment. This is not akin to the *Stirone* case where an indictment charging interference with the interstate movement of *sand transmuted into a trial which included charges involving the interstate movement of steel from a plant which was to be built using the sand specified in the indictment.* The circumstances here are more analogous to charging a defendant with interfering with the interstate movement of a specific grade of sand, such as that used to mix with mortar, then allowing the introduction of evidence with respect to a different grade

of sand, such as that used to make cement, and then instructing the jurors that they could convict the defendant if they found that he interfered with the interstate movement of sand.

The elaboration by this and other courts of the doctrine set out in *Stirone* further undermines the majority's reasoning. "The cases have found a constructive amendment where there is a complex of facts distinctly different from those set forth in the charging instrument and not ... where there is a single set of facts. C. Wright, *Federal Practice and Procedure*, Crim.2d § 516 at 27 (1982).... In addition, courts have found constructive amendments where the crime charged was substantially altered at trial, so that it was impossible to know whether the grand jury would have indicted for the crime actually proved." *United States v. Muelbl*, 739 F.2d 1175, 1180 (7th Cir.), *cert. denied*, 469 U.S. 982, 105 S.Ct. 388, 83 L.Ed.2d 322 (1984) (quoting *United States v. Von Stall*, 726 F.2d 584, 586 (9th Cir.1984)).

The evidence received concerning the handguns discovered during a lawful search and ruled admissible during the denial of the defendant's motion to suppress did not present the jury with a "distinctly different" set of facts. All the facts presented arose out of the defendant's drug trafficking scheme and his use of firearms in connection therewith.[2] Moreover, the crime charged was not "substantially altered at trial" by the introduction of the handguns evidence and the jury instructions. Leichtnam knew he was charged with the statutory crime of using a firearm in connection with his drug trafficking. The jury, after receiving over-whelming evidence of guilt, properly convicted him of a violation of 18 U.S.C. § 924(c), specifically the use of the Mossberg rifle found with the drug paraphernalia.

Moreover, examining the jury instructions in their entirety, as we must, casts further doubt on the majority's conclusion that the indictment was constructively amended. During the disputed instructions, the trial judge read the firearms indictment to the jury, including the specific reference only to the Mossberg rifle. The trial judge made no reference to the handguns evidence during his instructions. It is clear that in the segment of his instructions in which he made the reference to "a firearm", which the majority finds so decisive, he was, as is required, merely summarizing the elements of the firearm offense under 18 U.S.C. § 924(c). In his closing argument, the prosecutor did not refer to the handguns evidence either, but instead discussed only the "specific gun alleged" in the indictment, obviously the Mossberg rifle. Finally, the specific finding of the jury, a verdict which stated that they found the defendant guilty of "knowingly using and carrying *a* firearm during a drug trafficking crime"—not *firearms*—provides further indication that the jurors convicted Leichtnam on the evidence of the Mossberg rifle, which was found in the closet along with the other drug paraphernalia. Considering the evidence of the jury charge makes it highly unlikely that, in any manner, shape, or form, the "firearm" reference constructively amended the indictment in the eyes of the jury. Placing the reference to "a firearm" in its proper context when considering the totality of the jury charge undermines the majority's conclu-

---

**2.** In footnote two of its opinion, the majority argues that the prosecutor's statement that the indictment did not include the two handguns introduced at trial because "they were sufficiently attenuated from the drug evidence" demonstrates that the evidence presented on the handguns was "distinctly different" from that presented on the rifle. But the prosecutor did not say that the rifle and handgun evidence were "distinctly different"; he said the handguns were "attenuated from the drug evidence." That the prosecutor, when he was drawing up the indictment, believed he could tie the rifle more closely than the handguns to the drug evidence does not have any bearing on the nature of the firearms evidence presented at trial. In all likelihood, the prosecutor's statement was based on the fact that the handguns were found in the defendant's bedroom adjoining the closet in which the rifle was discovered along with the drug paraphernalia and not in the closet itself. I fail to see how the prosecutor's statement, much less the record, supports the majority's view that the rifle and the handguns in the instant case are as different as the sand and steel in *Stirone*.

sion that the instructions amounted to reversible error.

An analysis of these facts under our variance doctrine provides no alternative basis for reversal of the defendant's firearms conviction. A variance occurs when "the evidence proves facts different from those alleged in the indictment" causing the defendant to be "deprived of notice of the details of the charge against him." *United States v. Galiffa*, 734 F.2d 306, 311 (7th Cir.1984) (quoting *United States v. Salinas*, 654 F.2d 319, 323–24 (5th Cir. 1981)). The question of whether a variance occurred, however, need not be decided because a variance *is cause for reversal of a conviction only if the defendant has been prejudiced by the variance. Id.* at 311. A variance is not prejudicial unless it deprives the defendant of *"an adequate opportunity to prepare a defense" or exposes "him to a risk of being prosecuted twice for the same offense." Muelbl*, 739 F.2d at 1181 (emphasis added) (citation omitted). Neither circumstance exists in this case. The handguns evidence did not deprive the defendant of an adequate opportunity to prepare a defense. In fact, the defendant attempted, at a pre-trial evidentiary hearing, to have the search of his home (which resulted in the seizure of the drug paraphernalia, drugs, rifle and the handguns) declared unlawful. The trial judge denied the defendant's motion to suppress and ruled that the evidence obtained was the result of a lawful search. Leichtnam was thus well aware of the existence, as well as the probable introduction in evidence, of the handguns. The second concern expressed by the *Muelbl* court about variances in indictments—that they may lead to double jeopardy—also is not applicable to these facts. The evidence of the handguns spread across the record would bar Leichtnam from being charged again on the firearms count. Finally, as the majority acknowledges, substantial evidence was received at trial that the defendant violated 18 U.S.C. § 924(c) as to the Mossberg rifle. The rifle, it bears repeating, was found in a closet along with cocaine and drug paraphernalia. Therefore, the introduction *without objection of evidence of the other*

firearms and the trial judge's instructions which referred to "a firearm"— again, without objection—could not have prejudiced the defendant.* The rifle evidence alone was and is sufficient to support the jury's guilty verdict.

## II. CONCLUSION

Courts must use care in reversing convictions, such as Leichtnam's, that are overwhelmingly supported by persuasive evidence. This is especially true in this case when defendant's counsel failed to object to the introduction of the handguns evidence, failed to object to the allegedly erroneous jury charge, and failed to make a motion for acquittal at the close of trial. To upset a jury's verdict without firm support in precedent undermines public confidence in the criminal justice system and feeds the common and justifiable perception that too many guilty defendants evade justice by invoking legal technicalities. The majority attempts to dismiss this observation as nothing more than an assertion that public opinion ought to guide constitutional adjudication. Of course it should not, and nothing in this dissent suggests otherwise.

What I am stating is that too often Americans forget that the habits, customs and mores of the American people breathe life into the Constitution's words by creating a polity in which rights and freedoms are respected. The courts' enforcement of the Bill of Rights is supported by and, indeed, ultimately depends upon, a belief shared by most Americans that it is right and proper to protect those liberties. The moment this moral consensus is frayed, the courts will have difficulty preventing the erosion of our constitutional protections. They will be like the parchment promises of what until only recently were the constitutions of the Warsaw Pact countries: filled with elaborate catalogs of the "rights of the people" and systematically and brutally ignored in practice.

My point, then, is not (and never was) that poll results should determine the Constitution's meaning, but rather that we must be conscious that the true source of

**388**

the Constitution's (and the judiciary's) authority is the constitutional language itself combined with congressional enactments and buttressed by a moral consensus among our citizenry. When we take it upon ourselves to invoke the Constitution to reverse a criminal conviction that is in fact supported by overwhelming evidence properly received at trial, we must be firmly convinced that we are following the letter of the constitutional text as well as relevant precedents. When we misapply the controlling law, as I believe the majority does today, we diminish an already shaken public faith in the criminal justice system and in our constitutional order. And it is this public faith that keeps us free.

For these reasons, I dissent from the reversal of the defendant's firearms conviction.

