9 F.3d 113
 NOTICE: Seventh Circuit Rule 53(b)(2) states unpublished orders shall not be cited or used as precedent except to support a claim of res judicata, collateral estoppel or law of the case in any federal court within the circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Daniel GIVENS and Laverne Langston, Defendants-Appellants.
 Nos. 92-3548, 92-3549.
 United States Court of Appeals, Seventh Circuit.
 Argued June 1, 1993.
Decided Oct. 13, 1993.
 
 Before POSNER, Chief Judge, and COFFEY and EASTERBROOK, Circuit Judges.
 
 ORDER
 
 1
 The defendants Daniel Givens and Laverne Langston, along with seven other defendants, were charged in a nineteen-count indictment with mail fraud in violation of 18 U.S.C. Sec. 1341. Givens and Langston were jointly tried before a jury and were each convicted on thirteen of the nineteen counts of mail fraud. After the trial court denied a number of post-trial motions, it sentenced Givens to five years probation including ten months of work release and ordered him to pay $1,796,018 in restitution. The court likewise sentenced Langston to five years probation including 200 hours of community service and ordered her to pay $1,796,018 in restitution. The court also imposed a special assessment of $650 on each defendant ($50 per count). We affirm.
 
 I. BACKGROUND
 
 2
 Between 1985 and 1987 Daniel Givens and Laverne Langston participated in David Zamora's fraudulent scheme which in turn caused the Illinois Department of Employment Security ("IDES") to pay out more than $1.7 million in fraudulent claims for unemployment benefits to individuals who were not entitled to the benefits.[1] During the years in question, David Zamora ran an illegal business called Amigos, Ltd. which specialized in obtaining unemployment insurance benefits for undeserving individuals, i.e., illegal aliens. Zamora ran his illegal enterprise out of two Chicago bars and charged his clients up to $450 for assistance in obtaining fraudulent benefits from IDES. Zamora, on behalf of his clients, would falsify information when completing unemployment insurance applications and certifications and then submit the fraudulent claim forms to IDES. The fraudulent applications submitted by Zamora stated that the claimants were United States citizens (when in fact they were illegal aliens) as well as listing false residential addresses. Zamora and his employees would take the applications to the Illinois Department of Employment Security Local Office 8 where Givens, Langston, and Leonia Taylor (another defendant who pled guilty) were employed. Givens, Langston, and Taylor accepted bribes from Zamora to process the fraudulent applications without ascertaining a claimant's actual immigration status or proper address. Givens and Taylor would meet Zamora at the bar to complete claimants' unemployment insurance cards and assign job service code numbers without interviewing the claimants.
 
 
 3
 Givens worked at Local Office 8 as a Veterans' Employment Representative in the Disabled Veterans Outreach Program and was responsible for assisting veterans in their job searches. One of Givens' responsibilities was to interview claimants and provide each claimant with a job code number. He frequently assigned job code numbers to Zamora's clients without interviewing them while having knowledge that these claimants were in fact illegal aliens. Langston and Taylor were employed at IDES Local Office 8 as unemployment insurance technicians. They were responsible for the processing of the unemployment insurance applications as well as the claim certifications, as well as using the IDES computer to locate information on claimants, verifying applications for benefits, and inputting data.
 
 
 4
 Givens and Langston participated in and helped promote the success of Zamora's scheme by failing to report the fraudulent claims to their supervisors. In addition, they accepted gratuities to which they were not entitled including money, drugs, alcohol, cigarettes, coffee and sugar to process applications and claim certifications without questioning the accuracy of the information offered. They also made blank applications available to Zamora in order that he might complete the forms outside the IDES office. Furthermore, contrary to official policy, Zamora would meet with Langston in the parking lot prior to office hours and give her completed applications. The defendants also supplied Zamora with computer printouts revealing earnings of potential claimants. Based on this information Zamora would determine if the illegal alien had enough earnings to make the application for benefits profitable.
 
 
 5
 The fraudulent scheme was discovered when one of Zamora's employees became disgruntled and reported the operation to the federal authorities. On March 18, 1992, a Special Grand Jury returned an indictment charging Givens, Langston, Taylor, Zamora, and five other defendants with mail fraud. The indictment described Givens' employment responsibilities as follows:
 
 
 6
 "i. Defendant DANIEL GIVENS was employed as a 'Veterans Employment Representative I' at Local Office 8. In this capacity, defendant DANIEL GIVENS was responsible for maximizing employment opportunities for veterans. In addition, as a Veterans Employment Representative I, defendant DANIEL GIVENS interviewed claimants when they submitted applications for employment insurance benefits to determine the accuracy of the information that each claimant supplied. It was defendant DANIEL GIVENS' responsibility to verify whether each applicant was a United States citizen. If an applicant was not a United States citizen, defendant DANIEL GIVENS was required to reject that person's application for unemployment insurance benefits. DANIEL GIVENS was also responsible for verifying the accuracy of the addresses and social security numbers claimants provided. In addition, defendant DANIEL GIVENS' duties included determining the truth and accuracy of the claim certifications the recipients of unemployment insurance benefits submitted."
 
 
 7
 (Emphasis added). The indictment further described Langston's position as follows:
 
 
 8
 "j. Defendants LEONIA TAYLOR and LAVERGNE LANGSTON were employed as 'Employment Security Program Representatives' at Local Office 8. As Employment Security Program Representatives, LEONIA TAYLOR and LAVERGNE LANGSTON were responsible for interviewing claimants when they submitted applications for unemployment insurance benefits to determine the accuracy of the information that each applicant supplied. It was the responsibility of defendants LEONIA TAYLOR and LAVERGNE LANGSTON to verify whether each applicant was a United States citizen. If an applicant was not a United States citizen, defendants LEONIA TAYLOR and LAVERGNE LANGSTON were required to reject that person's application for unemployment insurance benefits. As Employment Security Program Representatives, defendants LEONIA TAYLOR and LAVERGNE LANGSTON were also responsible for verifying the accuracy of the addresses and social security numbers claimants provided. In addition, the duties of defendants LEONIA TAYLOR and LAVERGNE LANGSTON included determining the truth and accuracy of the claim certifications the recipients of unemployment insurance benefits submitted."
 
 Trial Proceedings
 
 9
 Several events at trial are pertinent to this appeal. Prior to the selection of the jurors, the government moved and the court granted the motion to strike surplus language in paragraph 1(i) (italicized portion of Givens' job description) because the description of Givens' position at IDES was inaccurate. At the close of evidence, the government moved and the court denied the motion to strike a portion of Langston's job description from the indictment because the judge refused "to mess around with the indictment at this stage of the game."
 
 
 10
 Secondly, just before closing arguments, defense counsel moved to recall a defense witness, Cinderella Owens-Martin. Since Martin was no longer present in the courtroom and because defense counsel had ample opportunity to examine and re-examine the witness when she was on the stand, the court denied the motion.
 
 
 11
 Finally, during jury deliberations, the foreman sent a note to the district court judge stating: "If section j. of Count I of the indictment is in error with regard to defendant Langston's job responsibilities, should it have any bearing on our decision." The trial judge responded:
 
 
 12
 "You must take all my instructions as a whole in reaching a verdict in this case. I do not want you to consider some instructions to the exclusion of others. Among the instructions you should consider, I have instructed you as to what an indictment is and what elements you must find in order to reach a verdict of guilty or not guilty."
 
 
 13
 The jury found Givens and Langston guilty of thirteen counts of mail fraud.
 
 II. ISSUES
 
 14
 Givens claims the trial court amended the indictment when it struck the portion of paragraph 1(i) describing Givens' job responsibilities. Langston argues that an impermissible variance occurred between the indictment and the proof at trial which resulted in prejudice to her by preventing her from adequately preparing her defense. She also claims the judge abused his discretion when he denied the motion to recall her witness, Owens-Martin.
 
 III. DISCUSSION
 A. Modification of Givens' Indictment
 
 15
 The Fifth Amendment provides in part "No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a grand jury...." In United States v. Miller, 471 U.S. 130 (1985), the Supreme Court stated that " 'a court cannot permit a defendant to be tried on charges that are not made in the indictment against him,' ... and therefore that 'after an indictment has been returned its charges may not be broadened through amendment except by the grand jury itself.' " Id. at 143 (quoting Stirone v. United States, 361 U.S. 212, 217 (1960)). Likewise, this court has held that "an amendment occurs when the offense proved at trial was not fully contained in the indictment, for trial evidence had amended the indictment by broadening the possible bases for conviction from that which appeared in the indictment." United States v. McNeese, 901 F.2d 585, 603 (7th Cir.1990) (quoting United States v. Kuna, 760 F.2d 813, 817-18 (7th Cir.1985)).
 
 
 16
 To guarantee a defendant's Fifth Amendment right to indictment by a grand jury, a court is not allowed to modify the indictment unless the modification is "merely a matter of form," Russell v. United States, 369 U.S. 749, 770, 82 S.Ct. 1038, 1050 (1962), or the modification eliminates "mere surplusage." McNeese, 901 F.2d at 603. In determining whether a modification was mere surplusage, we have asked whether it related to an "essential" or "material" element of the crime. United States v. Cina, 699 F.2d 853, 859 (7th Cir.1983). "An 'essential' or 'material' element of a crime is one whose specification with precise accuracy is necessary to establish the very illegality of the behavior and thus the court's jurisdiction." Id. Moreover, a material element is one that is sufficient "to cause prejudice to the defendant." Id. at 858. Finally, the government need not prove "every single fact in the indictment," United States v. Leichtnam, 948 F.2d 370, 377 (7th Cir.1991), as long as the "basis for conviction" is "contained in the original indictment." Id.
 
 
 17
 In the case before us, the indictment charged Givens with mail fraud for "[taking] bribes from DAVID ZAMORA to process and allow the processing of false and fraudulent unemployment insurance applications and claim certifications ..." and "[taking] bribes from defendant DAVID ZAMORA to influence the performance of [his] official duties." The jury was properly instructed on the requisite elements of mail fraud:
 
 
 18
 "First, that the defendants knowingly participated in the scheme to defraud as described in the indictment;
 
 
 19
 Second, that the purpose of carrying out the scheme or attempting to do so, the defendants caused the United States mails to be used in the manner charged in the particular count;
 
 
 20
 Third, that the defendants did so knowingly and with intent to defraud."
 
 
 21
 The trial testimony of David Zamora and Leonia Taylor established that contrary to IDES rules and policy Givens would spend Saturday afternoons at Barrerra's Lounge (Zamora's "office") filling out job service forms for illegal aliens in exchange for money and/or cocaine. Moreover, Givens never reported to his superiors that he suspected the claimants were illegal aliens.
 
 
 22
 "[T]he offense that formed the basis of [Givens'] conviction was clearly and fully set out in the indictment." Miller, 471 U.S. at 144. Therefore, we are of the mind and hold that the modification of the indictment did not broaden the charges against Givens; it merely eliminated surplusage that was neither essential nor material to the charge. Surplusage includes words that are "unnecessary to and independent of the allegations of the offense proved." McNeese, 901 F.2d at 604 (quoting Miller, 471 U.S. at 136-37). Thus we hold that the defendant was not prejudiced by the modification because the indictment provided him with clear notice of the charges and what the government was required to prove at trial. Leichtnam, 948 F.2d at 377; Cina, 699 F.2d at 859.
 
 
 23
 B. Variance of Proof in Langston's Indictment
 
 
 24
 Langston's argument is that a variance existed between the proof at trial and the allegations in the indictment (paragraph 1(j)) concerning her job description. As noted in Cina, we apply the same analysis to amendments as we do to variances. Cina, 699 F.2d at 858. Thus, we must determine whether the variance between what the formal grand jury indictment alleged and what the government established at trial was material and whether it broadened the charges against Langston.
 
 
 25
 Langston fares no better than Givens under this analysis. The indictment charged her with mail fraud and included a description of her job responsibilities at IDES. Although the government failed to establish each and every duty listed in her job description, the government did prove each and every element of the mail fraud charges. See supra. Count I of the indictment charged Langston with
 
 
 26
 (a) purposely avoiding asking claimants whether they were, in fact, United States citizens or legal residents of the United States.
 
 
 27
 (b) accepting information and documentation from applicants for unemployment insurance benefits that she knew was false and fraudulent;
 
 
 28
 (c) processing and allowing the processing of applications for unemployment insurance benefits when she knew that the applications were false and fraudulent; and
 
 
 29
 (d) failing to reveal the fraudulent scheme in which she participated to the proper authorities.
 
 
 30
 At trial, the government proved Langston's participation in this scheme through the testimony of David Zamora and Leonia Taylor. Zamora and Taylor testified that in exchange for cash, cigarettes and alcohol Langston would process stacks of fraudulent unemployment insurance applications and certification forms as well as provide Zamora internal IDES information regarding claimant's work histories. Moreover, because of the bribes she received from Zamora, Langston never reported to her supervisors that she had reason to suspect that the claimants were not United States citizens or that their addresses were fraudulent.
 
 
 31
 The minor variance between the indictment and the evidence at trial was not material because the evidence at trial was overwhelming in establishing the required elements of the crime charged in the indictment. The government need not establish every fact in the indictment provided the fraudulent scheme the government does prove falls within the scheme alleged. Leichtnam, 948 F.2d at 377. The factual inaccuracies in the indictment concerning Langston's job description and job title pale in light of the plethora of evidence against her. The evidence conclusively demonstrates that Langston knowingly accepted fraudulent applications and permitted Zamora's clients to receive benefits to which they were not entitled. The government's failure to establish each and every job responsibility set forth in the indictment did not broaden the charge against her and thus cannot be classified as an amendment. Miller, 471 U.S. at 143-45; McNeese, 901 F.2d at 604. Langston argues that she was prejudiced because she based her defense on refuting the allegations of her job description. We disagree, for even if her defense strategy was successful, the government would still have obtained a conviction by establishing each element of the mail fraud charges against her. Because the job description was immaterial to the charges and the alleged variance between the indictment and the proof did not broaden the charges against Langston, we affirm her conviction.
 
 C. Motion to Recall Witness
 
 32
 Finally, Langston asserts that the district court abused its discretion in denying the defense motion to recall Cinderella Owens-Martin. Langston argues that recalling Owens-Martin would not have delayed the trial and the failure of the court to recall her permitted the government to exploit her unclarified and inaccurate testimony.
 
 
 33
 "The district court has substantial discretion in its control of the presentation of evidence at trial. See Fed.R.Evid. 611(a). Permitting the recall of a witness is within the sound discretion of the district court." United States v. Dent, 984 F.2d 1453, 1463 (7th Cir.1993).
 
 
 34
 The record before us reveals that the defense called Owens-Martin and examined her thoroughly. After the government cross-examined the witness, she was re-examined by defense counsel and released. Following a recess over the weekend, defense counsel entered court Monday morning and requested leave to recall the witness to clarify some portions of her testimony. Defense counsel informed the court of the proffered questions he would ask the recalled witness and the court ruled that "She has given her testimony on the subject and I'm not going to allow you to recall her and re-ask them to her." Based on the record before us, the court did not abuse its broad discretion in denying the motion to recall the witness because defense counsel had an opportunity to not only examine the witness when he initially called her, but to reexamine her after the government had completed its cross-examination. A trial judge has the responsibility of conducting the trial and managing his trial calendar in the most efficient and expeditious manner possible and certainly should not be faulted for refusing to allow an attorney to recall a witness a second time after she has taken the stand before on direct examination, cross-examination and redirect examination. Permitting parties to recall witnesses every time the examination fails to elicit the desired testimony would result in unnecessarily prolonging trials as well as further clogging an already overburdened court system.
 
 
 35
 AFFIRMED.
 
 
 
 [1]
 IDES is the agency responsible for administering the state's unemployment insurance program and other job-related programs. IDES receives federal funding for some of its programs including funding to operate a job service program for veterans of the Uniated States armed services